UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TADEUSZ KOWALEWSKI, NICHOLAS
KLIMIUK, OLEG LOGUNOVSKI and
STANISLAW PUCHALA, individually and on behalf
of others similarly situated,

Plaintiffs,

v.

RUDOLF SAMANDAROV a/k/a RUDY
SAMANDAROV, GROUP AMERICAR
TRANSPORTATION LLC, BC LEASING, CORP.,
and individual partners of corporate defendants,

Defendants.

Civil Action No. 1:07-cv-06706
(RJS) (GWG)

DECLARATION OF TADEUSZ
KOWALEWSKI IN SUPPORT
OF PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION
TO DISMISS THE COMPLAINT

I, Tadeusz Kowalewski, declare as follows:

1.      In approximately May 2004, I started working for Defendant GROUP AMERICAR TRANSPORTATION LLC ("Group Americar"), as a driver number 96.

2.      At that time, Arkady Kogan, Group Americar's representative, informed me that I had to sign a contract. Mr. Kogan did not explain to me any of the terms or conditions of the contract I was about to sign. He did not allow me to read any part of the contract. He demanded that I sign the contract, right then and there in his presence, without reading it. After I signed the document, Mr. Kogan signed it as well.  (A true and correct copy of the Subscription Agreement is attached hereto as Exhibit "A".)

3.      At Group Americar, I worked as a limousine car driver. As part of my job, on an almost daily basis, I have driven customers back and forth between New York, New Jersey, Pennsylvania, and Connecticut.

4.      Defendant Rudolf Samandarov ("Samandarov") prohibited me to have any other customers aside from Group Americar's customers even when driving other customers would not interfere with the performance of my duties at Group Americar.

5. Samandarov enforced a very specific dress code. Samandarov demands that all Group Americar drivers and I, when on duty, always wear a white shirt, black suite, dress shoes, and tie. If not, Samandarov imposed a fine, ranging between $500 and $1,000 (see Exhibit "B").

6. Samandarov demanded that all Group Americar drivers and I, when on duty, always display a sign bearing Group Americar's name and logo in the front and in the back of their cars. If not, Samandarov imposed a fine, ranging between $500 and $1,000. Samandarov demanded that all Group Americar drivers drive only either Lincoln Town Car or Cadillac. In addition, Samandarov required that most Group Americar drivers buy their cars from Popular Ford Sales, Inc., located in Brooklyn, New York, even those drivers who have their own Lincoln Town Car or Cadillac. I had my own Lincoln Town Car in good condition. However, Samandarov prohibited me to use my car to drive Group Americar's customers and made me buy another car from Popular Ford Sales, Inc., (see also Class Action Complaint ¶ 68).

7. A pre-assigned job is an order for car service placed by a customer in advance, which usually pays close to or over $100. Pre-assigned jobs are coveted by the Group Americar drivers because they allow them to earn a significant amount, even after all the deductions from by Group Americar. However, the pre-assigned jobs are not given randomly by a dispatcher to any next available Group Americar driver. Rather, Samandarov personally determines which driver gets what pre-assigned job, if at all. A driver that owes a lot of money to Samandarov, Group Americar, BC Leasing, LOMTO, or Ford Credit usually gets to do a lot of pre-assigned jobs because this allows Samandarov to withhold the loan amounts, other fees, and a high interest rate from this driver's weekly paycheck/voucher. (See copies of pre-

assigned jobs I received which were personally approved by Samandarov attached hereto as Exhibit "C".)

On many occasions, I would receive a job, which would then be taken away from me because Samandarov intervened and assigned it to a driver of his choice. For example, on February 28, 2006, a job that was assigned to me first, was then assigned to different drivers by Samandarov (see Exhibit "D").

All Group Americar drivers and I were aware of an internal Group Americar rule that on any given day, a driver is first assigned three "local" jobs, which are jobs within New York City where a customer typically pays between $15 and $20 per job. Once the driver performs three local jobs, he is then eligible for what is referred to as an "OT" job, which is an out-of-town job, and involves driving a customer from Manhattan to Long Island, New Jersey, Pennsylvania, or Connecticut or from one location, say, in New Jersey to another location in New Jersey. Here also Samandarov personally determines which job a driver would receive. For example, Samandarov can direct a dispatcher to assign a particular driver a job involving driving a customer from Manhattan to Jersey City during rush hour. Such a job is disfavored by Group Americar drivers, because although technically it is considered an "OT" job, but it usually does not pay more than $50 and a driver spends a considerable amount of time, up to several hours, performing this one job. If a driver gets several jobs of this nature, he can spend the whole day driving the customers yet earn only a small amount. On the other hand, if Samandarov directs a dispatcher to assign a driver a job in southern New Jersey, Pennsylvania, Connecticut or on Long Island, in which case a customer usually pays considerably more, up to $300 and more, such a job allows the driver to earn a much higher amount.

8.      Additionally, all Group Americar drivers and I were aware of an internal Group Americar rule that if a driver's gross earnings are less than $25,000 per year, Samandarov will fire him or her. This means that the Group Americar drivers cannot determine themselves how much or how little they work for Group Americar. All drivers know that, at the very least, they have to exceed the $25,000 threshold to keep their jobs. Since Samandarov personally controls the assignment of the better-paying jobs, he can determine how long it would take, if at all, for any given driver to reach the $25,000 threshold.

9.      Samandarov instituted a Communication Committee and Security Council which he personally oversees and controls. The Security Council is essentially an internal judicial mechanism which allows Samandarov and Group Americar to impose fines on the drivers and enforce many regulations by Samandarov governing driver's conduct and income. The Scourity Council holds hearings and has power to find a driver "guilty or not guilty" of an alleged "offense", and impose monetary fines, which can be as high as $1,000. The Security Council keeps a record of "major offenses" for three years and of "minor offenses" for one year.

10.     Any Group Americar driver can be terminated at Samandarov's complete discretion. In 2006, I was terminated by Samandarov without any warning (see also Class Action Complaint ¶¶ 68-73 for a description of the forced sale of vehicle to me and how Samandarov took away my car and fired me from Group Americar).

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 21st, 2007, at Bushkill, Pennsylvania.

Tadeusz Kowalewski

4

# EXHIBIT A

N:\Lawyers\wib\Americar Transportation\Subscription Agreement.003.doc

Exhibit C

*522 West 37th street*
*New York, NY, 10018*

# SUBSCRIPTION AGREEMENT

SUBSCRIPTION AGREEMENT, made this _26_ day of _May_, 2004, by and between_ GROUP AMERICAR TRANSPORTATION LLC, a New York limited liability company authorized to do business in the state of New York (the "Company"), having its principal place of business at ~~1142B South Railroad Avenue, Staten Island, New York 10304~~ and _Tadeusz Kowalewski_ (hereinafter referred to as the "Subscriber"), having his or its principal place of business, or residing at, _1254 Pine Ridge, Bushkill, PA 18324_

The Company operates a two-way radio referral and dispatch transportation service in the City of New York. The Subscriber wishes to avail himself or itself of the services supplied by the Company's referral and dispatch network and to use the trade name and certain other products and services of the Company.

NOW, THEREFORE, in consideration of the mutual promises herein contained, and for other good and valuable consideration set forth herein, the parties agree as follows:

1.   The Subscription.

Contemporaneously with the execution and delivery of this Subscription Agreement, subject to the terms and conditions herein contained, the Company is selling to the Subscriber, and the Subscriber is purchasing from the Company, the right to participate in the Company's referral and dispatch network and to use certain other products and services in connection therewith, and the right to use the Company's trade name and a two-way radio and associated communications equipment that are and will remain the property of the Company and which may be installed by the Company in the Subscriber's vehicle, as described in paragraph 4.1 hereof (the "Installed Communications Equipment" or "ICE"). The Company currently uses a Nextel direct connect radio system and provides each Subscriber with a Nextel radio (the "Radio") equipping the Subscriber to receive and respond to radio calls from the Company's communications headquarters. All of the foregoing rights are hereinafter referred to as the "Subscription." The term of this Subscription Agreement is twenty years, commencing on the date hereof, and expiring on the twentieth anniversary of the date hereof (the "Term"); however, following the expiration of the Term, this Subscription Agreement may be extended from year to year upon the prior written consent of the Subscriber and the Company.

2.    Consideration.

In full consideration of the aforesaid sale, including, without limitation, the use of the Radio or the installation and use of the ICE, if installed, contemporaneously herewith, the Subscriber is delivering to the Company,

(i)    a subscription fee of $10,000 (the "Subscription Fee"), payable by (a) certified or bank cashier's check to the order of the Company in the amount of $___ ---- and

LOMTO

(b) a promissory note to the order of the ~~Company~~ in the principal amount of $ 10,000 with interest at a rate to be determined by the Company that is currently 12% per annum and with a term not to exceed three years, in the form annexed as Exhibit A hereto (the "Note"), and

(ii)    a weekly fee (the "Weekly Fee") of $45.00, which fee will be applied to the Weekly Fee in respect of the first week following the date of this Subscription Agreement.

3.    The Weekly Fee.

The Weekly Fee is payable by the Subscriber weekly, in advance, commencing on the first Friday following the date of this Subscription Agreement, whether or not the Subscriber, or any other authorized person or entity, actually uses the Subscription, for each week following the date of this Subscription Agreement so long as the Company is operating its radio dispatch network. Notwithstanding the foregoing, in the event of a strike, interruption of the Company's telephone or Radio service, act of God, governmental act prohibiting, suspending or otherwise interfering with the Company's operations or any other event or occurrence beyond the Company's control, which event or occurrence continues for a period in excess of 48 hours, the Subscriber shall be entitled to a pro rata reduction of the Weekly Fee for the duration of such event beyond such 48 hour period. The Company reserves the right, in its sole and unreviewable discretion to provide incentives to members of the Subscribers Committee by offering a reduced Weekly Fee.

3.1.    Weekly Fee Increases.    On each May 1st subsequent to the date hereof, the Company may increase the Weekly Fee to the Subscriber by an amount not to exceed 20% of the then current Weekly Fee. In addition, in the event, as a result of local, state or federal law, rule or regulation, additional fees or expenses are charged to the Company in connection with the operation of its business, such additional fees or expenses shall be added to and become a part of the Weekly Fee. Such addition to the Weekly Fee will not limit the Company from raising the Weekly Fee by up to 20% of the amount of the then current Weekly Fee on each subsequent May 1st.

4.    Agreements of the Company.

The Company covenants and agrees with the Subscriber as follows:

4.1.    Delivery and Maintenance of the Radio.    The Company shall provide Subscriber with a Radio in good working order. The Radio will be compatible with the Nextel direct connect radio system currently used by the Company and will enable the Subscriber to receive communications from the Company's radio dispatch headquarters. Alternatively, the Company may install an ICE in good working order in the Subscriber's vehicle. The ICE, if so installed, will be compatible with the Company's dispatch network and will enable the Subscriber to receive communications from the Company's radio dispatch headquarters. The Company will provide normal maintenance of the Radio or the ICE, if installed; however, such maintenance will not include repairs and servicing required as a result of damage (including, without limitation, water damage) to the Radio or the ICE, if installed, whether caused by accident, negligence, misuse, or breach of this Subscription Agreement. All repairs and

servicing required as a result of any such accident, negligence, misuse, or breach of this Subscription Agreement, including without limitation, removal and reinstallation of the ICE, if installed, will be at the Subscriber's sole cost and expense and will be performed at a service center designated in writing by the Company as a duly authorized service center.

      4.2.    Maintenance of Radio Dispatch Network.  The Company will maintain a radio dispatch network providing continuous uninterrupted service for passengers who call or otherwise contact the Company's dispatch headquarters.  The Company will provide to the Subscriber radio dispatches indicating the location of fares to be picked up by the Subscriber and will use its best reasonable efforts (consistent with customer preferences) to maintain a system that provides the Subscriber, together with all other subscribers, an approximately equal opportunity to answer such radio dispatches.

      4.3.    Interruption of Services.  In the event of a strike, interruption of the Company's telephone service, act of God, governmental act prohibiting, suspending or otherwise interfering with the Company's operations, or any other event or occurrence beyond the Company's control, the Company shall be excused from performing its obligations under this Subscription Agreement for the duration of such event and until its dispatch services may reasonably resume.

      4.4    Payment of percentage of New Subscriptions.  If the Subscriber is one of the first one hundred (100) Subscribers and is actively operating his Subscription and thereby submits vouchers to the Company during a calendar year having an aggregate face amount (exclusive of amounts representing tolls, parking, and other cash lay outs) of more than $25,000, he will have the right to receive .005 (one half of one percent) of the aggregate Subscription Fees paid to and collected by the Company during such calendar year by Subscribers subscribing after the first 100 Subscribers (the "New Subscriptions"), whether such payments are made as lump sums, downpayments or installment payments and includes interest.  Such right shall be personal and cannot be transferred to a prospective transferee of the Subscription, except to the Subscriber's heirs or personal representatives upon his death or permanent incapacity. Payments, if any, shall be made within 90 days after the end of each calendar year in which New Subscriptions are sold.

      4.5.    Loans from Health and Welfare Facility.  A committee of Subscribers shall operate a Health and Welfare Facility for the benefit of the Subscribers.  If the Subscriber has been a Subscriber for at least 90 days he will be entitled to apply for a loan or grant from the Health and Welfare Facility.  The Health and Welfare Facility committee may determine, in its sole discretion, the amount of any grant or loan, up to $4,000, and the terms and conditions thereof.

      5.    Agreements of the Subscriber.

      The Subscriber covenants and agrees with the Company as follows:

      5.1.    Use of the Subscription; Transfer of the Radio or ICE, if installed.  No other entity, including without limitation, any person, partnership or corporation, will use the

Subscriber's Subscription, including, without limitation, the Radio or ICE, if installed, and any other services provided to the Subscriber hereunder, and the Radio or ICE, if installed, shall not be removed or transferred to any other vehicle, whether or not such vehicle is owned by the Subscriber, without the prior written consent of the Company. Drivers who are not Subscribers must be authorized in writing by the Company prior to using the Radio or ICE, if installed, and the services of the Company. The Company's approval and authorization of a driver, other than the Subscriber, shall not be unreasonably withheld and may be conditioned upon such terms and conditions, including without limitation, a requirement that such driver, at his own cost and expense, undergo the Company's screening process and attend the Company's training program, as the Company deems appropriate. The Company reserves the right to revoke its approval and authorization of any driver, other than the Subscriber, at any time, in its sole and unreviewable discretion. Upon termination of this Subscription Agreement, whether by default, assignment of the Subscription, or otherwise, the Radio or ICE, if installed, which the Subscriber acknowledges are and at all times will remain the property of the Company, will be removed from the Subscriber's vehicle at the sole cost and expense of the Subscriber (in the case of an ICE) and if the Subscription and the Radio or ICE, if installed, are to be transferred to another vehicle, the Subscriber will bear the cost and expense of the removal and reinstallation thereof (in case of an ICE). In addition, the Subscriber will not pledge, mortgage, grant a security interest in, or otherwise encumber, the Radio or ICE, if installed, or his or its Subscription. As used in this Agreement, "transfer" shall mean the sale, assignment, pledge or other transfer of Subscriber's interest in the Subscription.

5.2.    Assignment of Subscription Agreement.  (a) The Company will agree with a lender that provides financing for the Subscriber's vehicle that in the event of a default by the Subscriber of his or its obligations to such lender, the Company will consent to an assignment of the Subscription (and the underlying right to use the Radio or ICE, if installed) at such lender's request; provided, that such assignee is satisfactory to the Company.

(b)  Except as provided in paragraph (a) above, the Subscriber, his heirs or legal representatives, if the Subscriber is an individual, or its successors and assigns, if the Subscriber is a partnership or corporation, shall not assign this Subscription Agreement without the prior written consent of the Company. Upon any assignment by the Subscriber, the Subscriber will pay to the Company ten percent (10%) of the purchase price plus any amounts then due to the Company from the Subscriber, whether owed in respect of the Weekly Fee, due under the Note, or otherwise, and will reimburse the Company for any expenses paid or incurred by the Company in connection with the transfer of the Subscription, including, without limitation, expenses in connection with the Company's review of prospective assignees, costs of investigation, credit evaluation and training. Any assignment to which the Company consents may be conditioned by the Company upon such additional terms and conditions as the Company may deem appropriate, plus, in each case, receipt by the Company of all amounts due to the Company from the Subscriber for his Subscription Fee, Weekly Fee, and/or Service Fee (as such term is hereinafter defined) as well as any charges incurred by the Company in connection with the assignment.

(c)    In the event of the death or incapacity of an individual Subscriber, the heirs or personal representatives of the Subscriber may, upon notice to the Company, succeed to

the Subscriber's interest in this Agreement without the Company's approval or payment of a transfer fee. In the event of the death or incapacity of the shareholder of a corporate Subscriber, the heirs or personal representatives of the shareholder of the Subscriber may, upon notice to the Company, succeed to the shareholder's interest in the Subscriber without the approval of the Company or payment of a transfer fee.

5.3.    Insurance; Risk of Loss.  From and after the date of this Subscription Agreement, the Subscriber shall maintain property insurance coverage under an all-risk policy in the minimum face amount of $50,000 property damage coverage, $200,000 of "no-fault" coverage, and liability coverage with respect to the operation of the Subscriber's vehicle in the amount of up to $1,500,000.  Subscribers must purchase primary liability insurance providing coverage of at least of at least $100,000 per person and $300,000 per occurrence.  In addition, Subscribers may be required to provide excess liability coverage of up to an additional $1,400,000. Each policy in respect of the foregoing coverage will name the Company as a party to be notified in the event of cancellation of such policy.  The Subscriber assumes all risks for any and all loss or damage to the Radio or ICE, if installed, including, without limitation, loss or damage caused by fire, theft, collision or water, whether or not such loss or damage is caused by the Subscriber's negligence.  At the Company's request, the Subscriber shall promptly deliver to the Company certificates evidencing that the required insurance is in full force and effect.

5.4.    Rules and Regulations.  The Subscriber will abide by all rules and regulations set forth in the Subscribers Committee manual, as the same may be amended from time to time by the Subscribers Committee.

5.5.    Fines; Penalties and Liabilities.  The Subscriber will bear the sole cost and expense for any and all fines, penalties or liabilities which may be assessed by reason of any action, inaction or conduct of the Subscriber, or any employee, lessee, agent, contractor or any other person, corporation or entity using the Radio or ICE, if installed.  The Subscriber authorizes the Company to deduct from the Subscriber's voucher checks the amount of any fine assessed by the Committee against the Subscriber or any employee, lessee, agent, contractor or any other person, corporation or entity using the Radio or ICE, if installed.

5.6.    Charge Account Customer Vouchers.  Upon receipt of a voucher from a charge account customer, the Subscriber, his employees, lessees or agents, will submit such voucher, whether from the Company, the Company's designated agent, or any credit card issuer approved by the Company, for payment to the Company or, if the Company so directs, to the Company's designated agent.  Each voucher payment made to the Subscriber shall be subject to the following fees:

i) Sixteen (16%) percent of the face amount of the voucher (exclusive of amounts representing tolls, parking and other cash lay outs) (the "Service Fee"), and

ii) $2.00 for each voucher (the "Additional Service Fee").

All vouchers submitted by a specified day each week will be paid within approximately two weeks from the specified submission date.  Upon request by the Subscriber,

voucher payments will be made on a one week basis by check to the Subscriber and will be subject to an additional fee equal to 3% of the face amount of the voucher (the "Expedited Service Fee").

The Company pays into the Health and Welfare Facility $1.00 of each Additional Service Fee charge until the amounts the Company has remitted from vouchers submitted by the Subscriber reach $1,500. Thereafter, the total amount of the Additional Service Fee will be retained by the Company. When the Subscriber's Subscription is terminated for any reason, the Company will reimburse the Subscriber the Additional Service Fees paid during his Subscription up to an amount equal to $1,500, less the amount of any grants or loans made to the Subscriber by the Health and Welfare Facility pursuant to Section 4.5 hereof.

The Company reserves the right to increase the Service Fee, the Additional Service Fee and/or the Expedited Service Fee in the event, as result of local, state or federal law, rule or regulation, additional fees or expenses are charged to it, or to its designated agent, as the case may be, in connection with the operation of its or their business. The Company also reserves the right to increase the Service Fee, the Additional Service Fee and/or the Expedited Service Fee on each May 1st following the execution hereof; provided, that no such increase may exceed 20% of the preceding year's Service Fee, Additional Service Fee and/or the Expedited Service Fee, as the case may be. In addition, the Company reserves the right, in its sole and unreviewable discretion to provide incentives to Committee members by offering reduced Service Fees, Additional Service Fees and/or the Expedited Service Fees.

5.7.    Cash Payments. The Subscriber will be entitled to retain 100% of the fares received from customers who pay in cash.

5.8.    Maintenance of Vehicle and Quality of Service. In order that customers referred by the Company may be provided with a consistent level of service and are assured that a Subscriber or authorized driver is providing the service requested by the customer, the Subscriber shall maintain a Lincoln Towncar, Cadillac Brougham, or other comparable luxury car that the Company may require from time to time as the industry and/or customer preference changes, which shall not be more than six (6) model years old, in good operating condition. For identification purposes, the Subscriber's vehicle shall be a uniform color prescribed from time to time by the Company. In special circumstances, use of a vehicle more than six (6) model years old may be approved by the Company in its sole discretion. The Subscriber will at all times maintain a clean vehicle and offer customers referred by the Company courteous and efficient service. Any violation of these requirements, as evidenced by a customer complaint or a visual inspection of the Subscriber's vehicle, shall constitute a material breach of this Subscription Agreement and shall entitle the Company to terminate the Subscription Agreement upon ten (10) days prior written notice to the Subscriber. The Company may inspect the Subscriber's vehicle at any time.

5.9.    Non-Competition. From the date of this Subscription Agreement until the first anniversary of the termination or assignment of this Subscription Agreement, the Subscriber will not offer transportation services to any party that is presently a customer referred to Subscribers by the Company or its Affiliates or that becomes a customer referred to Subscribers

by the Company or its Affiliates prior to the termination or assignment of this Subscription Agreement. The Subscriber acknowledges that the remedy at law for a breach of the Subscriber's agreement set forth in this paragraph 5.9 would be wholly inadequate, and therefore, the Company and/or its Affiliates shall be entitled to preliminary and permanent injunctive relief and specific performance of the agreement herein contained without the posting of a bond or other security.    This paragraph 5.9 constitutes an independent and separable agreement of the Subscriber and shall be enforceable notwithstanding any rights or remedies that the Company and/or its Affiliates may have under any other provisions of this Subscription Agreement, or otherwise. If any or all of the provisions of this paragraph 5.9 are held to be unenforceable for any reason whatsoever, it shall not in any way invalidate or affect the remainder of this Subscription Agreement which shall remain in full force and effect.

5.10.  Discounts. The Company may but shall not be required to participate with a Subscriber in absorbing any and all discounts offered to a customer. The amount of any discount not absorbed by the Company will be absorbed by the Subscriber.

5.11.  Customer Service Charges. A customer service charge is a charge which is passed on directly to customers and is not a charge against the Subscriber. The Company reserves the right in its sole and unreviewable discretion to increase, decrease, or terminate the customer service charge applicable to any customers.  The Company, or the Company's designee, retains the full amount of any applicable customer service charge.

6.      Independent Contractor.

The Subscriber is and shall remain an independent contractor and shall not be deemed to be an employee or agent of the Company. The Subscriber shall at all times be free from the control or direction of the Company in the operation of the Subscriber's vehicle and the Company shall not supervise or direct the services to be performed by the Subscriber, except as specifically otherwise set forth herein. As an independent contractor, the Subscriber shall be responsible, *inter alia,* for obtaining and paying for government licenses and permits required for the operation of Subscriber's vehicle, oil, gas, vehicle repairs, insurance, traffic and parking violations, and other items required for the operation of the Subscriber's business.

7.      Training Program.

Before commencement of the use of the Subscription, the Subscriber shall, if requested by the Company, attend a training program of approximately 8 hours, which together with additional training, may take up to 16 hours. The training program, if any, will be taught to Subscribers, at a cost of up to $100 per Subscriber, by the Company's personnel, once per week at the Company's radio dispatch headquarters in Staten Island, New York. The need for the training program shall be determined on a case-by-case basis depending on the Subscriber's familiarity with the use of the Radio or ICE, if installed, use protocols and his prior experience as a driver. In addition, the Subscriber may be expected to attend two special annual meetings of the Subscribers (or more, if necessary) at which meetings, changes in Radio or ICE, if installed, protocols, voucher submission procedures, proposals for changes in equipment, and general issues and problems affecting Subscribers as a group will be discussed.  Up to two discussion

groups per year may also be held, at which small groups of Subscribers will meet to review and refresh their understanding of the Committee's rules and regulations and to discuss certain targeted problems. The Company's representatives may attend these discussion groups. The Company may also require each new approved driver, who is not a Subscriber, to attend a training program. Such non-Subscriber drivers are charged a fee for training based upon the amount of training received; such fee does not currently exceed $500 per driver.

8.    Indemnification.

The Subscriber shall indemnify and hold harmless the Company, its Affiliates, and their respective officers and directors (together the "Indemnified Parties" and individually each, an "Indemnified Party") from and against and in respect of any and all damage, loss, liability, cost and expense (including, without limitation, fees of counsel), resulting or arising from or incurred in connection with:

(a)    Injury to person or property due wholly or in part to any act, default, or omission of Subscriber, or Subscriber's agent(s), or occasioned by failure of Subscriber, or Subscriber's agent(s), to comply with any provision hereof;

(b)    Any misrepresentation, breach of warranty or non-fulfillment or non-performance of any agreement, covenant, term or condition on the part of the Subscriber, its lessees, employees or agents under this Subscription Agreement, and the Subscriber agrees to pay to the Indemnified Party the amount which would then be required to put such Indemnified Party in the position that it or he would have been in had such representation or warranty been true, correct and complete, or had such agreement, term or condition been performed, complied with or fulfilled; and

(c)    Any and all actions, suits, proceedings demands, assessments, judgments, cost or expenses (including, without limitation, the fees of counsel) relating to any of the foregoing.

9.    Termination of the Subscription Agreement by the Subscriber.

The Subscriber may terminate this Subscription Agreement in the event of a material breach of, or default under, this Subscription Agreement by the Company or on any grounds available by law.

10.    Termination of the Subscription Agreement by the Company.

The Company may terminate this Subscription Agreement as follows:

(a)    This Subscription Agreement may be canceled and annulled at any time within the one year period following the date that the Subscriber shall have commenced the use of his Subscription (the "Probationary Period"), if the Subscriber or any driver using the Subscription breaches the Subscription Agreement or any rule or regulation or is the subject of a customer complaint. In the event of such cancellation, the Company will return to the Subscriber

all money paid on account of the Subscription purchase as of the date of the cancellation less (i) all money earned by the Subscriber through the use of his Subscription, as evidenced by vouchers cashed by or submitted to the Company or its agent, and (ii) $200, representing expenses incurred by the Company in connection with processing the Subscription.

(b)     The Company may terminate this Subscription Agreement at any time in the event the Subscriber shall make an assignment for the benefit of creditors or shall admit in writing his or its inability to pay his or its debts as they become due, or shall commence a voluntary case under any applicable bankruptcy, insolvency or similar law or shall file any petition or answer seeking for himself or itself any reorganization, arrangement, composition or readjustment under any law or shall file any answer admitting or not contesting the material allegations of a petition filed against him or it in any such proceeding, or shall seek a consent to or acquiesce in the appointment of any trustee or receiver of himself or itself or of all or any substantial portion of his or its properties, or if a court having jurisdiction in the premises shall enter a decree or order for relief in respect of him or it in an involuntary case under any applicable bankruptcy or insolvency law, or if within sixty days after the commencement of any action against him or it seeking any reorganization, arrangement, composition or readjustment under any law, such action shall not have been dismissed or all orders or proceedings thereunder affecting his or its operations shall not have been stayed or if within 30 days after the appointment of any trustee or receiver of him or it or of all or any substantial portion of his or its properties, such appointment shall not have been vacated.

(c)     The Company may terminate this Subscription Agreement at any time if the Subscriber defaults in the payment of any amounts due to the Company hereunder if such default is not cured within 30 days following written notice from the Company to the Subscriber demanding payment of such defaulted amount, or if the Subscriber defaults in or breaches any of his obligations under this Subscription Agreement (other than the payment of money) including, without limitation,

(i)    if the ICE, if installed, is removed from the Subscriber's vehicle without the prior written authorization of the Company,

(ii)   if the ICE, if installed, is transferred to any other vehicle without the prior written authorization of the Company,

(iii)  if the Radio or ICE, if installed, is repaired by any party other than an authorized service center designated in writing by the Company,

(iv)   if the marker identifying the Company as the owner of any property is removed without the prior written authorization of the Company,

(v)    if the Radio or ICE, if installed, or the Subscription is pledged, encumbered, used as collateral, subjected to a lien or used as a security interest without the prior written authorization of the Company,

(vi)  if the Subscriber fails to pay for the removal or transfer of the ICE, if installed, upon an assignment of the Subscription,

(vii)  if the Subscriber fails to insure his vehicle or the operations of his Subscription as required under paragraph 5.3 of this Subscription Agreement, or fails to deliver to the Company certificates evidencing such insurance upon request therefor by the Company,

(viii)   if the Subscriber permits any other entity, including without limitation any person, partnership or corporation, to use the Radio or ICE, if installed, or the services of the Company without the prior written authorization of the Company,

(ix)   if there is a substantial violation or repeated violations of the Committee's rules and regulations,

(x)  if the Subscriber fails to comply with the requirements of Section 5.8 of this Subscription Agreement,

(xi)  if the Subscriber tampers with the Radio, ICE, if installed, or software associated therewith,

(xii)  if the Subscriber threatens or commits any act of violence toward another Subscriber or any subscriber of an affiliate of the Company or toward any officer, employee, or agent of the Company or any affiliate of the Company,

(xiii)   if the Subscriber submits any false billing information to the Company or its agent, or steals or otherwise converts any property belonging to or any service provided by the Company,

(xiv) if the Subscriber fails to offer courteous service to a customer,

(xv)  if the Subscriber fails to comply with the requirements of Section 5.9 of this Subscription Agreement,

(xvi)  if the Subscriber fails to indemnify the Company or the Company's Affiliates in accordance with Section 8 of this Subscription Agreement,

(xvii)   if the Subscriber fails to comply with any applicable law, rule, ordinance, etc., or

(xviii)  if the Subscriber breaches any other of its obligations under this Subscription Agreement.

11.   Damages.   (a)   Upon termination of this Subscription Agreement by the Subscriber following a material breach of, or default under, this Subscription Agreement by the Company, the Subscriber shall be entitled to receive from the Company an amount determined by multiplying (x) the difference between twenty and the number of full years of the Term that

elapsed prior to termination of this Subscription Agreement by the Subscriber, by (y) a fraction, the numerator of which is the Subscription Fee and the denominator of which is twenty. The amount, if any, so determined shall constitute the sole damages to which the Subscriber shall be entitled as a result of a material breach of, or default under, this Subscription Agreement by the Company. The Company shall be entitled to offset any amount owed to the Subscriber under this Section (a) by any principal and interest then remaining owing under the Note.

(b)   Upon termination of this Subscription Agreement following a breach or default by the Subscriber, the Company shall be entitled to retain the Subscription Fee and in addition shall be entitled to damages, which shall include, without limitation, the following:

(i)   Weekly Fees for each week that the Subscriber retains possession of the Radio, or the ICE, if installed, remains in the Subscriber's vehicle,

(ii)   any costs incurred or paid in connection with the replacement and repair of the Radio and/or the removal, repair and reinstallation of the ICE, if installed, and

(iii)   reasonable expenses, including, without limitation, attorneys' fees, disbursements and court costs incurred or paid in connection with the termination of the Subscription Agreement and the recovery, removal and reinstallation of the ICE, if installed.

(c)   Upon early termination of this Subscription Agreement following a breach or default by the Subscriber, the Subscriber shall continue to be obligated: under Section 5.2 hereof to return the Radio or the ICE, if installed, to the Company; under Section 5.9 not to offer transportation services independently to customers referred to Subscribers by the Company; under Section 8 to indemnify and hold the Company harmless; under Sections 2 and 5.5 to continue payments, if any, due to the Company. In addition to the foregoing continuing obligations, the Subscriber will continue to be obligated to pay all monies due to the Company irrespective of the reasons therefor and shall be required to remove all logos and service marks bearing the words "Americar" or "Group Americar" or other proprietary logo or mark of the Company.

12.   Notices.   All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given when personally delivered or mailed by registered or certified mail, to the addresses herein designated, or at such other address as may be designated by notice as provided herein to the other party. If to the Subscriber, at the address given in the prefatory Section of this Agreement; and if to the Company, Group Americar Transportation LLC, 1142B South Railroad Avenue, Staten Island, New York 10304 Attn: Rudolf Samandarov, Manager.

13.   Amendments and Entire Agreement.

(a)   This Subscription Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior understandings, representations, warranties, promises and undertakings made orally or in writing between the parties hereto.

(b) All Subscription Agreements may be amended upon the consent of the Company and the consent of a majority of Subscribers who (i) have submitted vouchers to the Company or its agents within the twelve month period prior to the delivery of notice of the Company's or the Subscriber's intention to amend all Subscription Agreements and (ii) who are Subscribers on the date they execute a consent or the date a meeting of Subscribers is held for the stated purpose of amending all Subscription Agreements. Such consents may be in writing or may be given at a meeting of Subscribers called on proper notice given at least ten (10) days prior to such meeting. Such meetings of Subscribers shall be held in the City of New York.

(c) Each amendment properly consented to shall be binding on all Subscribers even if they did not consent thereto.

(d) This Subscription Agreement may also be changed or modified by a written instrument executed by the parties hereto.

14.    Parties in Interest. This Subscription Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; provided, any assignment by the Subscriber is made pursuant to the terms and conditions set forth in this Subscription Agreement.

15.    Law to Govern. This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of New York without reference to the conflicts of laws principles thereof.

16.    No Waiver, Cumulative Remedies. No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other further exercise thereof or the exercise of any other right, power or remedy hereunder. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law.

17.    Severability. If any part of this Subscription Agreement is found to be contrary to public policy or declared invalid for any reason such a finding or declaration shall not invalidate any other part of this Subscription Agreement.

18.    Section and Other Headings. The section and other headings contained in this Subscription Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Subscription Agreement.

19.    Proper Licenses. The Subscriber shall exhibit to the Company, upon the Company's request, all licenses required by law, regulation, order or otherwise of governmental agencies and departments having jurisdiction over the Subscriber in connection with the ownership, operation and use of the Subscription.

20.    Arbitration; Waiver of Trial by Jury. (a) The sole and exclusive method of resolving any claim or controversy whatsoever between the Company, its Affiliates, and their

respective officers, directors, other agents, employees and shareholders on the one hand and the Subscriber, its Affiliates, officers, directors, other agents, employees and shareholders on the other hand, unless otherwise specified in this Subscription Agreement, shall be binding arbitration according to the procedures set forth in this section. Disputes which shall be subject to binding arbitration are: (i) the amount of payment for or deduction from Subscriber's voucher payments; (ii) any monetary fine assessed against a Subscriber pursuant to Rules and Regulations promulgated under this Subscription Agreement; and (iii) any claim for discrimination of work offered to Subscriber or Subscriber's driver. The procedure to be followed by the Subscriber with respect to any controversy set forth in subsection (i), (ii) or (iii) of this paragraph shall be the following: in each instance, Subscriber shall first submit such claim or controversy to the Appeals Committee of the Company, and if the aggrieved Subscriber is not satisfied by the decision of the Appeals Committee of the Company, then Subscriber shall submit the same to binding arbitration conducted by a single arbitrator and administered by the American Arbitration Association under its Commercial Arbitration Rules, or by such other independent and impartial organization as may be designated by the Company, and the determination rendered by the arbitrator shall be final and may be entered in any court having jurisdiction over the parties. In any claim or controversy not within the scope of subsection (i), (ii) or (iii) of this paragraph, submission to the Appeals Committee of the Company shall not be required. In any arbitration hereunder, each party shall bear its own expenses, including legal fees; provided, however, that in the event the Subscriber recovers more than two-thirds of the amount in controversy, the Company shall reimburse the Subscriber's filing fees but no other expenses or fees. An arbitrator shall have the authority to award compensatory damages only. This section shall not apply to: (i) any claim or cause brought by the Company to enforce a non-competition agreement between the parties herein; (ii) any claim or cause arising from or in connection with the termination of this Subscription Agreement; and (iii) any claim or cause arising from or in connection with the suspension of the use of this Subscription by the Subscriber. Each claim or controversy required to be arbitrated pursuant to this provision must be submitted in writing first to the Appeals Committee of the Company within sixty (60) days after the date the claim or controversy arose (if such submission is required), and must be submitted to arbitration in accordance with the applicable arbitration rules within one hundred and eighty (180) days after the date the Appeals Committee of the Company renders its final determination on such claim or controversy or within 180 days from the date the claim or controversy arose if submission to the Appeals Committee of the Company is not required by this section. These limitations on the time for submitting claims and controversies shall be applicable to such claims and controversies notwithstanding any longer period that may be provided by statute or the Commercial Arbitration Rules, and failure to submit such claims and controversies in a timely manner shall be a complete bar to such claims or controversies.

(b)     For all matters not subject to arbitration as provided in Section 20(a) above and to the extent permitted by law, the respective parties hereto hereby waive trial by jury in any action, proceeding, cross claim or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Subscription Agreement, the breach thereof, and the operation thereunder, for any claim of damage, whether compensatory or punitive, restitution, or any other claim for money of any kind.

21.    <u>Assignment by the Company</u>.  The Company shall have the right, in its sole discretion, to assign the Subscription Agreement or all or any of its obligations and rights hereunder provided that the assignee of the Company's obligations under such assignment is, in the Company's reasonable judgment, able to perform the Company's obligations under this Agreement. Upon such assignment, the Company shall have no further liability to the Subscriber for the obligations assigned.

22.    <u>Miscellaneous</u>. For the purposes of this Agreement when used with reference to a specified person, "Affiliate" shall mean (i) any Person who directly or indirectly controls or is controlled by or is under common control with the specified Person, (ii) any Person who is (or has the power to designate) an officer of, general partner or manager in or trustee of, or serves (or has the power to designate a Person to serve) in a similar capacity with respect to, the specified Person, or of which the specified Person is an officer, general partner, manager, or trustee, or with respect to which the specified Person serves in a similar capacity, and (iii) any Person who, directly or indirectly, is the beneficial owner of 20% or more of any class of equity securities of the specified Person or of which the specified Person is directly or indirectly the owner of 20% or more of any class of equity securities; and "Person" shall mean an individual, corporation, limited liability company, partnership or other form of association, or trust.

IN WITNESS WHEREOF, the parties hereto have caused this Subscription Agreement to be duly executed as of the day and year first written above.

GROUP AMERICAR TRANSPORTATION LLC

By: _____

_____
(Subscriber)

# EXHIBIT B

**Re:   Live OT's**

Live OT's will be dispatched as follows:

1.  15 minutes to the pick up

2.  30 minutes to the pick up

3.  40 minutes to the pick up

4.  50 minutes to the pick up

5.  60 minutes or better to the pick up

No unit is allowed to book into the live OT zone unless following the above dispatch rules.  If the unit is caught, he will be sent to Security for stealing, which holds a minimum fine of $1,000.  No exceptions!!

Thank you

Chairman of Communications

1

**Group American**

# Memo

**To:** Drivers and Dispatch room

**From:** Communications

**Date:** 11/14/2005

**Re:** <u>ATTENTION ALL DRIVERS and Dispatch room!!</u>

---

1. Priority/Combat will be in effective starting immediately.

2. When a driver gets a priority, he will have preference to go on top of the list in zones 1, 4, 5, 50, 59, 70.

3. When a driver gets a combat, he will have an option to use it for an OT $50 or more after 6PM

4. Priority and Combat can only be used the same day you receive it or you lose it.

5. Dress code/Clean car rules are in effective immediately. Any unit that does not follow the rules will be fined $100

6. Any unit that abuses any Communication member verbally or fiscally, 1st offense will be $1,000, no exceptions. 2nd offense $2,500, 3rd offense you will get expelled.

<u>**Thank you**</u>

1

**Group American**

# Memo

**To:**  Drivers and Dispatch room

**From:**  Chairman of Communications

**Date:** 11/15/2005

**Re:**  2 Hours Priority

---

<u>2 Hours priority will be given for the following:</u>

- **When you are on a job for over 30 minutes and the job is cancelled, you will be put on the top of the list in that zone and you will have 2 hours priority, starting on your E.T.A or reservation of your next job.**

- **If your previous job was cancelled and the next job you receive is going OT and it pays $50 or more, you will not have priority with that job.**

- **If you are chased or you have bid on a job from one of the Manhattan zones to any borough.**

- **When you are chased or you have bid from one borough to another.**

- **When you are chased or you  have bid from Newark Airport to Staten Island**

- **If you are chased to a zone above 125th Street from Manhattan, Queens or the Bronx**

****************All Priorities start on your E.T.A or the reservation time***********

***********When there are two drivers on a car, they are only allowed to use their own priority*****************

***If you are on an OT job and you get cancelled 15 min or less.  You will be put back in your original position, you will not receive a priority*************************

Thank you

**Chairman of Communications**

1

**Group
Americar**

# Memo

**To:**   All Drivers

**From:** Management

**Date:** January 30, 2006

**Re:**   Communications Committee

Combat is as follows:

From 5am – 9am and 6pm – 11pm

*3* locals or boroughs combined will receive combat ($65 or higher)

Thank you.

Communications

**Group**
**Americar**

# Memo

**To:**   All Drivers

**From:** Management

**Date:** January 30, 2006

**Re:**   Communications Committee

Starting ASAP ALL drivers need the following:

- Cars clean

- Uniform (white shirt, tie, jacket)

- Magnetic sign on car

The fines are as follows:

- Dirty car - $50

- Out of uniform - $50

- No magnetic sign - $25

No exceptions!!!!!!!!!

Thank you.

Communications

1

**Group
Americar**

# Memo

**To:**   All Drivers

**From:** Management

**Date:** January 30, 2006

**Re:**   Communications Committee

---

Starting ASAP

If you forfeit or reject a job, you are off the air for 2 hours.

On forfeits you have 3 mins to get in touch with the dispatcher and get the job back that you forfeit.

No Exceptions

Thank you.

Management

1

# EXHIBIT C

*Falls Village*
*Ct.*
*Attached*

Sullivan & Cromwell

Directions to: Michael M. Wiseman
4 River Lane
Westport, CT  06880
(203) 227-7511

*2 Horses.*

Take I-95 to Exit 17 in Connecticut. Head east on the exit

ramp and turn left on Saugatuck Avenue. Continue on

Saugatuck Avenue/CT-33 through four traffic lights. About a mile

and a half after the fourth light, you'll come to River Lane. Make

a right onto River Lane.

TENTATIVE; Not yet reviewed by Mr Wiseman.

Sullivan & Cromwell

Directions to: Michael M. Wiseman
               Steep Road
               Falls Village, CT  06031
               (860) 824-7494

Take the Major Deegan to the Thruway north to Route 287 (the Cross Westchester Expressway) to Route 684 north. 684 north becomes Route 22. Take Route 22 to Millerton, CT, and shift to Route 44 east at Millerton. Take Route 44 to Route 112 east, which will end at Route 7. Turn left (north) on Route 7. Take Route 7 about a mile to Route 63. Make a right on Route 63 and make an immediate left onto Barnes Road. (There is a gas station at this intersection. Barnes Road is almost directly across from the gas station). Take Barnes Road to its end and turn right on Under Mountain Road. Take Under Mountain about a mile and a half to Canaan Mountain Road. Make the left onto Canaan Mountain Road and follow it for 2.4 miles to a sharp right hand curve.* At this curve a dead end dirt road (Steep Road) goes off to the left. Take Steep Road. There will be a sign on Steep Road directing you where to go.

*If you pass a lake, you've gone too far on Canaan Mountain Road.

TENTATIVE: Not yet reviewed by Mr Wiseman.

**Account #:** 125     **Sub:** 0000000000     SULLIVAN_CROMWELL     **VIP #:** S033010     **Priority:** A
**DISPATCH**     5542331

| | |
|---|---|
| **Auth. Person:** COHEN, RODGIN | **Passenger:** COHEN, RODGIN |
| **Requested Time:** 08/31/2005 05:20:00 | **Scheduled Time:** 08/31/2005 04:27:00 |
| **Dispatch Time:** 08/30/2005 14:52:43 | ☑ **Reservation**     ☐ **Override** |

**Car #:** 0096     **ETA:** 15     **Digit:** 205     **Car Type:** Sedan     **No. of Cars:** 1
**Driver #:** 1215

┌─Options─
│ ☐ Name Sign
│ ☐ Credit Card
│ ☐ Wheel Chair
│ ☐ Animal
│ ☐ Car Phone
│ ☐ Smoking
│ ☐ Presidential
│ ☑ >=98
│ ☐ Time Job
│ ☐ Non Smoking
│ ☐ Package
│ ☐ Heavy Package
│ ☐ GWT ☐ Share
│ ☐ OnHold
│ ☐ Round Robin
│ ☐ Multiple Stops
│ ☐ EZ Pass

┌─Pickup─
│ **State/Bo:** NJ
│ **Town:** IRVINGTON
│ **Landmark:**
│ **Building #:** 21
│ **St Name:** MATTHIESSEN PARK
│ **X Street:**
│ **Disp/Price:** 72
│ **Area:**
│ **PU Point:** IRVINGTON
│ **Phone #:** 2125583465 Ext:

☞

┌─Destination─
│ **State/Bo:** LGA
│ **Town:**
│ **Landmark:**
│ **Building #:**
│ **St Name:**
│ **X Street:**
│ **Disp/Price:** 50     LGA
│ **Area:**
│ **DestPoint:**
│ **Phone #:** Ext:

**Payment:** Voucher     ☑ **VC Req.**     **Fare:** $95.00
**Credit Card:**     **CCard #:**     **Exp. Date:**

┌─Operator text─

┌─Account text─
│ OK-10/18---MUST SWN!!! K-92;K-96;K-85 ---------ONLY FOR VIPS: AQUILLA, COHEN  WEISMAN

┌─VIP text─

Account #:  125    Sub: 0000000000    SULLIVAN_CROMWELL    VIP #:  $033010    Priority:  A
DISPATCH    5542331

Auth. Person:    COHEN, RODGIN    Passenger:    COHEN, RODGIN
Requested Time:    08/31/2005 05:20:00    Scheduled Time:    08/31/2005 04:12:00
Dispatch Time:    08/30/2005 14:52:43    ☑ Reservation    ☐ Override

Car #:  0096    ETA: 15    Digit: 205    Car Type: Sedan    No. of Cars: 1
Driver #:  1215

**Options**
- ☐ Name Sign
- ☐ Credit Card
- ☐ Wheel Chair
- ☐ Animal
- ☐ Car Phone
- ☐ Smoking
- ☐ Presidential
- ☑ >=98
- ☐ Time Job
- ☐ Non Smoking
- ☐ Package
- ☐ Heavy Package
- ☐ GWT  ☐ Share
- ☐ OnHold
- ☐ Round Robin
- ☐ Multiple Stops
- ☐ EZ Pass

**Pickup**
State/Bo: WE
Town: IRVINGTON
Landmark:
Building #: 21
St Name: MATTHIESSEN PARK
X Street:
Disp/Price: 81
Area:
PU Point: IRVINGTON
Phone #: 2125583465 Ext:

☞

**Destination**
State/Bo: LGA
Town:
Landmark:
Building #:
St Name:
X Street:
Disp/Price: 50  LGA
Area:
DestPoint:
Phone #: Ext:

Payment:  Voucher
Credit Card:

☑ VC Req.
CCard #:

Fare:    $96.00
Exp. Date:

**Operator text**
MATTHIESSEN PARK

**Account text**
OK-10/18---MUST SWN!!! K-92;K-96;K-85 -----------ONLY FOR VIPS: AQUILLA, COHEN  WEISMAN

**VIP text**

Account #:    833    Sub:  0000000000    JENNISON-GRAND CENTRAL    VIP #:  06    Priority:  A

Auth. Person:    MADIGAN, KATE
Requested Time:    09/20/2005 16:30:00
Dispatch Time:    09/19/2005 15:39:16

Passenger:    MADIGAN, KATE
Scheduled Time:    09/20/2005 15:30:00
☑ Reservation    ☐ Override

**Options**
- ☐ Name Sign
- ☐ Credit Card
- ☐ Wheel Chair
- ☐ Animal
- ☐ Car Phone
- ☐ Smoking
- ☐ Presidential
- ☑ >=98
- ☐ Time Job
- ☐ Non Smoking
- ☐ Package
- ☐ Heavy Package
- ☐ GWT ☐ Share
- ☐ OnHold
- ☐ Round Robin
- ☐ Multiple Stops
- ☐ EZ Pass

Car #:  0096    ETA: 15    Digit: 799
Driver #:  1215

Car Type: Sedan    No. of Cars: 1

**Airport**
Airport:  JFK
Airline:  DELTA DOMESTIC
Terminal:  TERM 3
Flight #:  1990
From City:  TAMPA
PU Point:  AREA E SWN
Comment:
M & G:  ☑
Disp/Price:  59    JFK

**Destination**
State/Bo:  WE
Town:  RYE
Landmark:
Building #:  19
St Name:  HOLLY LANE
X Street:
Disp/Price: 81
Area:
DestPoint:
Phone #:  9175938884 Ext:

Payment:  Voucher
Credit Card:

☐ VC Req.
CCard #:

Fare:    $100.00
Exp. Date:

Operator text

Account text

VIP text

# EXHIBIT D

**Details ===>**

| | | | |
|---|---|---|---|
| Dispatch : | 02/28/2006 14:24:25 | | |
| Knock Off : | 02/28/2006 14:30:10 | | |
| On Scene : | 02/28/2006 14:35:52 | | |
| Circle : | | | |
| No Show : | | | |
| Load : | 02/28/2006 14:35:55 | | |
| Bail Out : | | | |
| Unload : | 02/28/2006 14:35:57 | | |

| | | | |
|---|---|---|---|
| Call Back | : 0 | Job Number | : 0 |
| Driver Number | : 002121 | Car Number | : 0073 |
| Action | : C | Random Digit | : |
| Reason | : N | Channel | : 0 |
| Unload Zone | : | Stop Wait Flag | : |
| ETA Time | : 10 | Combat Points | : 0 |
| Waiting Time | : 0 | Sequence | : 1 |
| Stop Wait Time | : 0 | | |

---

------------------Transmission ------------------

Car  :  Status  :  T

Date/Time  :  02/28/2006 14:23:52

| | | |
|---|---|---|
| Name | : | MICHAEL JANESEN |
| From Call Taking | : | 02/28/2006 12:25 |
| To Call Taking | : | 02/28/2006 12:25 |

Call Notepad

| Operator/Time | Notepad Text |
|---|---|
| CARNETTE, DONNA 02/28/2006 14:25 | K 96 |
| ROSS, NIGAH 02/28/2006 14:29 | ivm |
| CARNETTE, DONNA 02/28/2006 14:41 | K 47 DID THIS JOB |

**Account #:** 28    **Sub:** 0000000000    NATIONAL AUSTRALIA BANK    **VIP #:** 07    **Priority:** A

**Auth. Person:** JANESEN, MICHAEL
**Requested Time:** 02/28/2006 14:45:00
**Dispatch Time:** 02/28/2006 14:24:25
**Car #:** 0073    **ETA:** 10    **Digit:**
**Driver #:** 2121

**Passenger:** JANESEN, MICHAEL
**Scheduled Time:** 02/28/2006 14:15:00
☑ **Reservation**    ☑ **Override**
**Car Type:** Sedan    **No. of Cars:** 1

Options
☐ Name Sign
☐ Credit Card
☐ Wheel Chair
☐ Animal
☑ Car Phone
☐ Smoking
☐ Presidential
☑ >=98
☐ Time Job
☐ Non Smoking
☐ Package
☐ Heavy Package
☐ GWT ☐ Share
☐ OnHold
☐ Round Robin
☐ Multiple Stops
☐ EZ Pass

Airport
**Airport:** EWR
**Airline:** AIR CANADA
**Terminal:** TERM A
**Flight #:** 766
**From City:** TORONTO
**PU Point:** OUTSIDE DR 4 SWN
**Comment:** 917-716-6579
**M & G:** ☑
**Disp/Price:** 96    EWR

Destination
**State/Bo:** M
**Town:**
**Landmark:**
**Building #:** 31
**St Name:** UNION SQ W
**X Street:** E 15 ST
**Disp/Price:** 2    M2
**Area:**
**DestPoint:** CORN OF 16TH ST
**Phone #:** 9177166579 Ext:CELL

**Payment:** Voucher
**Credit Card:**

☑ **VC Req.**
**CCard #:**

**Fare:**    $59.00
**Exp. Date:**

Operator text
SWN---

Account text
SWN----

VIP text

# Action List

Date: 03/02/2006    13:21                                                Page:    1    of    4

Confirmation# 0600011567

| Time | Action | Car# | Operator | Field | Original / New Content | Workstation |
|---|---|---|---|---|---|---|
| 02/28/06 14:35 | Unload | 0073 | | | | |
| 02/28/06 14:39 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:39 | Destination Key | 0047 | | | | |
| 02/28/06 14:40 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:52 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 12:25 | Call Initiated | | GOLFAND, ALISA | | | EXT-3226 |
| 02/28/06 12:25 | Operator Viewed | | GOLFAND, ALISA | | | EXT-3226 |
| 02/28/06 13:54 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 13:56 | Call Updated | | CARNETTE, DONNA | pu_phone | 8884227533 | EXT3034 |
| 02/28/06 13:56 | Call Updated | | CARNETTE, DONNA | status_flag | R L | EXT3034 |
| 02/28/06 13:56 | Call Updated | | CARNETTE, DONNA | req_date_time | 02/28/2006 14:43:00 02/28/2006 14:45 | EXT3034 |
| 02/28/06 13:56 | Call Updated | | CARNETTE, DONNA | pu_date_time | 02/28/2006 13:43:00 02/28/2006 13:56 | EXT3034 |
| 02/28/06 13:56 | Operator Viewed | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 13:56 | Call Sent | 0096 | | | | |
| 02/28/06 13:56 | AutoDp dispatch | 96 | | Action Text | Round: Primary Zone AutoDispatcher Version American 5.01 B | EXT-3035 |
| 02/28/06 13:56 | Call Accepted | 0096 | | | | |

# Action List

Date:  03/02/2006    13:21

Confirmation#  0600011567

| Time | Action | Car# | Operator | Field | Original / New Content | Workstation |
|---|---|---|---|---|---|---|
| 02/28/06 13:57 | Destination Key | 0096 | | | | EXT3034 |
| 02/28/06 13:57 | KnockOff Viewed | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 13:57 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 13:58 | Call Updated | | CARNETTE, DONNA | override_dsp_date_ | N / Y | EXT3034 |
| 02/28/06 13:58 | Call Updated | | CARNETTE, DONNA | pu_date_time | 02/28/2006 13:56:00 / 02/28/2006 14:15 | EXT3034 |
| 02/28/06 13:58 | Pre-empt | 0096 | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 13:58 | Arrival Check | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:15 | Call Sent | 0073 | | | | |
| 02/28/06 14:15 | AutoDp dispatch | 73 | | Action Text | Round: Primary Zone AutoDispatcher Version Americar 5.01 B | EXT-3035 |
| 02/28/06 14:15 | Call Accepted | 0073 | | | | |
| 02/28/06 14:15 | Destination Key | 0073 | | | | |
| 02/28/06 14:20 | KnockOff Viewed | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:20 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:21 | Re-dispatch | 0073 | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:21 | Call Sent | 0128 | | | | |
| 02/28/06 14:21 | Manual Assign | 0128 | CARNETTE, DONNA | dsp_date_time | Feb 28 2006 2:21PM | EXT3034 |

# Action List

Date: 03/02/2006    13:21

Page:  3  of  4

Confirmation# 0600011567

| Time | Action | Car# | Operator | Field | Original / New Content | Workstation |
|---|---|---|---|---|---|---|
| 02/28/06 14:21 | KnockOff Viewed | | ROSS, NIGAH | | | EXT-3031 |
| 02/28/06 14:21 | Operator Viewed | | ROSS, NIGAH | | | EXT-3031 |
| 02/28/06 14:23 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:23 | Load | 0128 | | | | |
| 02/28/06 14:23 | Call Forfeited | 0128 | | | | |
| 02/28/06 14:23 | Call Sent | 0047 | | Action Text | Round: Primary Zone AutoDispatcher Version American 5.01 B | EXT-3035 |
| 02/28/06 14:23 | AutoDp dispatch | 47 | | pu_disp_zone | 70 96 | |
| 02/28/06 14:24 | Call Accepted | 0047 | | | | |
| 02/28/06 14:24 | KnockOff Viewed | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:24 | Call Updated | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:25 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:26 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:27 | Destination Key | 0047 | | | | |
| 02/28/06 14:27 | Operator Viewed | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:28 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:29 | Operator Viewed | | CARNETTE, DONNA | | | EXT3034 |

**Action List**

Date:  03/02/2006    13:21                                                      Page:    4    of    4

Confirmation#  0600011567

| Time | Action | Car# | Operator | Field | Original / New Content | Workstation |
|------|--------|------|----------|-------|------------------------|-------------|
| 02/28/06 14:29 | Operator Viewed | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:29 | KnockOff Viewed | | ROSS, NIGAH | | | EXT-3031 |
| 02/28/06 14:29 | Destination Key | 0073 | | | | |
| 02/28/06 14:30 | Call Knockd Off | 0047 | ROSS, NIGAH | | | EXT-3031 |
| 02/28/06 14:30 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:31 | Dispatcher View | | CARNETTE, DONNA | | | EXT3034 |
| 02/28/06 14:35 | Destination Key | 0073 | | | | |
| 02/28/06 14:35 | On Scene | 0073 | | | | |
| 02/28/06 14:35 | Load | 0073 | | | | |

**Total Number of Records: 57**