UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

TADEUSZ KOWALEWSKI, NICHOLAS
KLIMIUK, OLEG LOGUNOVSKI and
STANISLAW PUCHALA, individually and on
behalf of other similarly situated,

        Plaintiffs,

v.

RUDOLF SAMANDAROV a/k/a RUDY
SAMANDAROV, GROUP AMERICAR
TRANSPORTATION LLC, BC LEASING,
CORP. and individual partners of corporate
defendants,

        Defendants.
-----------------------------------------------------------

Declaration of
Rudolf Samandarov

Civil Action No.
07 CIV 6706

(RJS)

I, Rudolf Samandarov, declare as follows:

1. I am the individual defendant and President of Defendants' Group Americar Transportation LLC ("Americar") and BC Leasing Corp. ("BC Leasing") in the above captioned action. I submit this declaration in response to the declarations of plaintiffs Tadeusz Kowalewski ("Kowalewski"), Oleg Logunovski ("Logunovski") and Nicholas Klimiuk ("Klimiuk") all dated November 21, 2007 and in further support of my application to dismiss this case as the proper forum to resolve disputes among these parties is by arbitration pursuant to paragraph 20 of the Subscription Agreement entered into between Americar and the respective plaintiffs.

### Reply Point 1
### Plaintiffs Had 699 Other TLC Companies To Do Business With Other Than Americar; and Their Argument of No Alternatives Is Without Merit

2. There is no dispute that each plaintiff entered into their respective Subscription Agreements, each document contains the same paragraph 20 that provides that disputes

among these parties are to be resolved by arbitration. Plaintiffs argue that this court should not honor these arbitration agreements because the plaintiffs were without "alternatives" other than to enter into these subscription agreements. See paragraph 10 of the plaintiffs' memorandum of law. This is just wrong. The parties herein are a part of the Black Car or For-Hire Vehicle Industry that provides vehicle transportation to the public in New York City. This industry is governed primarily by the Taxi and Limousine Commission of the City of New York (TLC). TLC places on its web site, among many other sources of information, a short two page brochure for "Understanding the For-Hire Vehicle Industry" which is attached as Exhibit A. According to this TLC brochure this industry (not including "Yellow Cabs") has 35,298 for hire vehicles ("FHV"). These FHV are affiliated with 700 licensed bases. Americar is just one of these 700 licensed bases. These plaintiffs could have joined any one of these other 700 licensed bases in the event any one of these plaintiffs objected or disliked any of the terms or provisions offered to him in the applicable Subscription Agreement. Plaintiffs claim that they had no alternatives other than to enter into the applicable Subscription Agreement not only defies logic but is just a fabricated untruth in an attempt to defeat their prior agreement to resolve disputes herein by arbitration rather than this court.

Reply Point 2
Plaintiffs Admit that the Americar Representative Made No
Prior Representations to Induce Them to Enter the Arbitration Clause
<u>in Fact Made No Prior Representation as to the Entire Subscription Agreement</u>

3. None of the plaintiffs deny entering into the identical Subscription Agreements. In fact their complaint states affirmatively that they did. None of the plaintiffs were forced to sign it. They had alternatives. They could have gone to any of the other 699 For Hire companies that operate under this Industry. Or, they could have affiliated themselves

with a Yellow Cab company. There is no claim that the Americar representative made a false statement to them about any of the terms of this Subscription Agreement. To the contrary Klimiuk, Logunowski and Kowalewski in their respective declarations in opposition to this application with mirror statements complain that the Americar representative "Mr. Kogan did not explain to me any of the terms or conditions of the contract I was about to sign." [Emphasis Added] See paragraph 1 of the Klimiuk Declaration and paragraph 2 of the Kowalewski Declaration. Logunovski stated, "Samandarov did not explain to me any of the terms and conditions of the contract, I was about to sign." [Emphasis Added] See paragraph 2 of the Logunovski Declaration. The Subscription Agreement speaks for itself, no other claim or representation was made but contained in the document itself. These plaintiffs should not be able to successfully argue that any fraudulent statement was made to them to induce them to agree to the arbitration clause. In fact plaintiffs make no such claim. The fact is either I or my assistant provided plaintiffs as much time as they desired before entering these agreements.

Reply Point 3
Uniformity of Operation of Drivers as Mandated by TLC
Does Not Remove Drivers From Being Independent Contractors

4. TLC as a condition of issuing either a base license for Americar or a For-Hire license to plaintiffs impose various rules. These rules are contained in TLC's Chapter 6 entitled "For-Hire Vehicles" and available on its web site. The various complaints listed by Klimiuk, Logunovski and Kowalewski in their declarations are rules required by TLC. Americar is required to follow these rules. For example these plaintiffs argue again with identical sentences that, "when on duty, always display a sign bearing Group Americar's

name and log in the front and in the back of their cars." See paragraph 6 of the Kowalewski Declaration, paragraph 5 of the Klimiuk Declaration and paragraph 6 of the Logunovski Declaration. However, this rule is required by TLC. See section 6-12 (f) (1) of Chapter 6 of the TLC that provides, "No for-hire vehicle shall be used in the course of operations of a for-hire vehicle service unless the vehicle is in compliance with the following: (f) (1) The marking requirements of the Commission, including, but not limited to: Exterior identification of the base name[1] and base vehicle number". As to standardized dress code section 6-07 (C) requires the maintenance and enforcement of rules governing the conduct of the drivers while performing their duty as for-hire vehicle drivers. At Americar the subscribers elect a Chairman who selects five members to create and enforce its rules. This is similar as how other Black Car companies operate. This minimal control does not interfere with when the driver begins or ends his day, where he works, where he can purchase the tools for his business or in any other way that effects the control of this business. Each driver still uses the car as he sees fit, takes it home during non working hours, uses it for personal errands, can obtain any insurance he sees fit as long as it meets with the TLC standards. See Exhibit A herein. As to plaintiffs' claim that I determine who gets the jobs, it is simple not true. The jobs are given out on a first come first serve basis. The claim that I require drivers to purchase cars from a certain source is just not true. TLC provides certain standards such as how old a car can be and to this end to comply with TLC standards certain cars that a driver may seek to use can be rejected based upon Industry standards[2]. Also, being a member of this Industry for more than twenty five years I have established relationships with certain

---

[1] Herein the base name is Group Americar Transportation LLC.
[2] For example, the car must have at least three doors. See TLC Rule Section 6-11(h)(1)

4

suppliers. To that end, I or my representatives recommend certain suppliers. However, the driver may use any vehicle he chooses as long as it meets Industry standards. The drivers set their own hours, purchase their own gasoline and EZ passes, are responsible to pay for their own insurance, are responsible for the maintenance of their limousines and may even hire drivers to work for them. The drivers retain 100% of the cash payments from customers, while the Americar earns a processing fee and a percentage of fares from passengers who pay by credit cards or via vouchers. Americar withholds no taxes. Americar provides new drivers with a brief training session, but thereafter the drivers conduct is governed by the independent committee. This committee is elected by the subscribers at large by election of a Chairman who selects five members.

Reply Point 4
Plaintiffs Attempt to Mislabel the Dispute they May have with
BC Leasing as to Certain Vehicles to Somehow Constitute a "Termination"
of their Subscription Agreement with Americar is Misplaced

5. Plaintiffs attempt to mislabel the dispute they may have with BC Leasing as to certain vehicles to somehow constitute a "termination" of their Subscription Agreement with Americar is misplaced. BC Leasing is a separate entity that leases vehicles to drivers. In some instances when drivers seeks to obtain a better rate for vehicle insurance he may apply to have his vehicle registered with the Department of Motor Vehicles under BC Leasing. At no time has Americar terminated nor threatened to terminate any of the plaintiffs Subscription Agreements. The Subscription Agreements provide each plaintiff with various rights separate from the use of the vehicles. The Subscription Agreements grants the plaintiffs as subscribers "the right to participate in the Company's referral and dispatch network". See paragraph 1 of the applicable Subscription Agreements attached as Exhibits C, D and E to my affidavit of October 25, 2007. It is up to each subscriber to

provide a vehicle for such use. See paragraph 5.8 of the Subscription Agreement. Klimiuk in paragraph 11 of his declaration references paragraphs 81-87 of his complaint as to the alleged facts comprising how his Subscription agreement was terminated. However, when reviewing these paragraphs there is no mention of the word "termination" or that the Subscription Agreement somehow was ended. Rather paragraph 81 discusses a loan Klimiuk obtained from LOMTO (League of Mutual Taxi Owners, a Federal Credit Union). LOMTO is independent of any Defendant herein and has been serving the New York City Livery Industry with financing for more than seventy-five years. In order to allow Klimiuk to obtain this loan, Americar guaranteed its repayment. Klimiuk has defaulted in this loan. Americar is now liable. Americar filed a counterclaim as to this issue with this court. See defendants' Fifth Counterclaim attached as Exhibit B to my October 25, 2007 Affidavit. However, the Subscription Agreement remains in full force and effect. Plaintiff raises the issue of termination only after I moved to compel arbitration as termination of the Subscription Agreement because termination is an exception to compel arbitration. A review of the complaint and the absence of any claim of termination of the Americar Subscription Agreement make it clear that this recent claim of termination is fabricated for the sole purpose of attempting to defeat the arbitration of the claims herein.

6. Paragraphs 83 to 87 of the complaint again are totally devoid of any reference to termination of the Subscription Agreement. Rather these paragraphs refer to the purchase of a vehicle by Klimiuk with a loan from Ford Credit. Herein, the vehicle was register under BC Leasing so that Klimiuk could obtain a better insurance rate. BC Leasing paid the insurance premiums for this vehicle that Klimiuk received the benefit, but remains in

default whereby he owes BC Leasing $9,585.92. See Defendants' Sixth Counterclaim attached as Exhibit B of my October 25, 2007 Affidavit. Again no mention in the complaint herein as to termination of the Americar Subscription Agreement. Again Klimiuk merely references these paragraphs of the complaint in his paragraph 11 of the Declaration to mislabel these claims to avoid the consequences of the arbitration agreement.

7. Kowalewski also by paragraph 10 of his Declaration references certain paragraphs of the complaint to wit paragraphs 68-73 and makes the unfounded claim that these paragraphs somehow constitute his termination of the Americar Subscription Agreement. I never terminated this Subscription Agreement and neither had anyone from Americar do so. Of course no one from BC Leasing could and no one from BC Leasing did terminate Kowalewski's Subscription Agreement with Americar. These paragraphs never use the word "terminate" or anything similar. Rather they claim a dispute arising out of the use of a vehicle and whether insurance was paid. The vehicle in question was never owned by Kowalewski, rather rented to him with an option to buy. See defendant's Sixth Affirmative Defense attached as Exhibit B to my October 25, 2007 Affidavit. As to the issue of insurance premiums, BC Leasing made the payments but Kowalewski who in turns remains obligated for this debt to BC Leasing. As to the claims by BC Leasing against Kowalewski see the Third Counterclaim as Exhibit B to my October 25, 2007 Affidavit which seeks this compensation. This certainly is not Americar seeking to terminate the Subscription Agreement which remains in full force and effect. Plaintiffs now seek to mislabel these non terminating events to avoid the consequences of arbitration.

## Conclusion

8. Plaintiffs agreed to arbitration when they entered into the Subscription Agreement. Both plaintiffs and defendants have claims against each other. When they decided to do business with each other a few years ago, they agreed that, "the sole and exclusive method of resolving any claim or controversy whatsoever...shall be binding arbitration." One of the exceptions to this agreement was in the event Americar seeks to terminate the Subscription Agreement then this provision of arbitration would not apply. Nowhere has Americar sought to terminate the Americar Subscription Agreement with any of the plaintiffs. Plaintiffs are still absolutely eligible to receive customer information from Americar for vehicle transportation. Nowhere have they alleged that Americar has withheld sending them customer information. They can still enter into agreements with other drivers to receive these dispatches as long as these drivers are duly licensed by TLC. They can still sell this Subscription Agreement if they so choose. The plaintiffs recent attempt to mislabel disputes between themselves as to the use of two vehicles with BC Leasing in their recent (November 21, 2007) declarations is without merit simply to wrongly classify these events as terminating the Americar Subscription Agreement.

9. By reason of the foregoing it is respectfully submitted that plaintiffs' claims are in the wrong venue, defendants motion to dismiss based upon the arbitration clause of the respective Subscription Agreements should be enforced and this complaint and the counterclaims should be dismissed without prejudice so that the parties may assert their claims by arbitration.

November 27, 20007

Rudolf Samandarov

A

Case 1:07-cv-06706-RJS   Document 23   Filed 11/28/2007   Page 9 of 13

# Understanding the For-Hire Vehicle Industry*

**For-Hire Vehicle (FHV) Bases**
The TLC licenses three types of bases. These include 'base stations' which provide livery or community car service, 'black car bases', and 'luxury limousine bases.' TLC rules state how each type of base operates. All FHV bases have some of the same requirements. Other rules are specific to the type of base. The type of base license determines the type of vehicles that work with the base and the type of service they provide.

| Licensed Bases - 700 Total | |
|---|---|
| Base Stations (Livery Bases) | 500 |
| Black Car Bases | 69 |
| Luxury Limousine Bases | 131 |

**For-Hire Vehicles (FHVs)**
TLC issues only one type of vehicle license. Vehicle owners choose certain types of vehicles to provide different kinds of service.

| Affiliated FHVs - 35,298 Total | |
|---|---|
| Livery | 19,974 |
| Black Car | 10,633 |
| Luxury Limousine | 4,691 |

Chapter 6, section 1 of TLC Rules defines a For-Hire Vehicle as:
*A motor vehicle carrying passengers for-hire in the City, with a seating capacity of twenty passengers or less, excluding the driver, with three (3) or more doors, other than a taxicab, coach, wheelchair accessible van, commuter van or an authorized bus operating pursuant to applicable provisions of law, and not permitted to accept street hails from prospective passengers in the street and required to be licensed by the Commission.*

**Industry Specific Rules for FHV Bases**
Base stations (i.e. livery bases) must provide:
- Off-street parking and storage for FHVs. There must be enough parking spots for half of the vehicles that work for a base.
- Worker's Compensation coverage and benefits to all eligible workers.
- A new or renewal application that includes a comprehensive operating plan (COP), statements of no objection from their city council member, community board, and local police precinct.
- An environmental assessment statement (EAS) when the base station is applying as a new licensee or relocating.

Black car and luxury limousine bases must:
- Receive 90% of their payments through contracts rather than cash.
- Become members of the New York Black Car Operators' Injury Compensation Fund, Inc. Bases that own at least 50% of their vehicles must provide Workers Compensation insurance instead.

Black car bases must have a franchise agreement (approved by the Attorney General's Office) or a Cooperative Contract.
Luxury limousine bases must charge passengers on the basis of garage to garage service on a flat rate basis or per unit of time or mileage.

| VEHICLE INSURANCE REQUIRMENTS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| # of Passengers | BASE STATION | | | BLACK CAR BASE STATION | | | LUX LIMO BASE STATION | | |
| | PIP | Per Person | Per Occurrence | PIP | Per Person | Per Occurrence | PIP | Per Person | Per Occurrence |
| 1-8 | $100,000 | $300,000 | $200,000 | $200,000 | $100,000 | $300,000 | $200,000 | $500,000 | $1,000,000 |
| 9-15 | N/A | N/A | N/A | $200,000 | N/A | $1,500,000 | $200,000 | $500,000 | $1,500,000 |
| 16-20 | N/A | N/A | N/A | $200,000 | N/A | $5,000,000 | $200,000 | $5,000,000 | $5,000,000 |

*\*Please note that the information contained in this document is not intended as a complete statement of the laws, rules and regulations governing for-hire vehicles, owners, bases and drivers in New York City; the provision of for-hire transportation in New York City by liveries, black cars and luxury limousines is governed by chapter 6 of the Rules of the NYC Taxi & Limousine Commission and applicable law, which are controlling as to any matter asserted herein.*

# FHV BASE LOCATIONS

### 500 Base Stations



Brooklyn, 222
Queens, 148
Bronx, 55
Manhattan, 53
Staten Island, 22

| Most Popular Vehicles, and Average Age | | | |
|---|---|---|---|
| Livery (19,974) | Lincoln Town Car | 73% | 7.25 years-old |
| | Ford Crown Victoria | 14% | |
| | Mercury Grand Marquis | 6% | |
| | Other | 7% | |
| Black Car (10,633) | Lincoln Town Car | 90% | 4.5 years-old |
| | Mercedes Benz S Class | 2% | |
| | GMC Yukon | 1% | |
| | Other | 7% | |
| Luxury Limousine (4,691) | Lincoln Town Car | 61% | 2.75 years-old |
| | Ford Crown Victoria | 6% | |
| | Cadillac DTS | 7% | |
| | Other | 26% | |

### 69 Black Car Bases



Brooklyn, 25
Queens, 30
Bronx, 2
Manhattan, 11
Outside NYC, 1

### Livery Vehicle Location
#### 19,974 Total



Bronx 4,258 - 21%
Manhattan 4,702 - 24%
Brooklyn 5,658 - 28%
Queens 5,016 - 25%
Staten Island 340 - 2%

| Driver Snapshot 50,356 Total | |
|---|---|
| Average Age | 45 |
| Driving for over 5 years | 50% |
| Live in NYC | 88% |
| Male | 97% |

### 131 Luxury Limousine Bases



Staten Island, 2
Queens, 50
Brooklyn, 13
Outside NYC, 40
Bronx, 5
Manhattan, 21

| Top 10 Countries of Birth | |
|---|---|
| DOMINICAN REPUBLIC | 24% |
| USA | 9% |
| PAKISTAN | 7% |
| ECUADOR | 6% |
| INDIA | 5% |
| CHINA | 4% |
| BANGLADESH | 4% |
| HAITI | 3% |
| RUSSIA | 3% |
| EGYPT | 3% |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
TADEUSZ KOWALEWSKI, NICHOLAS
KLIMIUK, OLEG LOGUNOVSKI and
STANISLAW PUCHALA, individually and on
behalf of other similarly situated,

      Plaintiffs,

v.

RUDOLF SAMANDAROV a/k/a RUDY
SAMANDAROV, GROUP AMERICAR
TRANSPORTATION LLC, BC LEASING,
CORP. and individual partners of corporate
defendants,

      Defendants.
------------------------------------------------------------

Affirmation of Service

Civil Action No.
07 CIV 6706

State of New York )
County of Kings   ) ss.:

    Eric B. Kaviar an attorney duly admitted to the Courts of New York state, affirms under the penalties of perjury as follows:

    On November 28, 2007 I served on behalf of the defendants its Reply Brief and Declaration of Rudolf Samandarov by depositing a true copy thereof enclosed in a postage-paid wrapper, in an official depository under the exclusive care and custody of the U. S. Postal Service in New York State to:

    Marina Trubitsky and Associates PLLC
    11 Broadway, Suite 861
    New York, New York 10004

By: _____
        Eric B. Kaviar

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 07 CIV 6706

------------------------------------------------------------

TADEUSZ KOWALEWSKI, NICHOLAS
KLIMIUK, OLEG LOGUNOVSKI and
STANISLAW PUCHALA, individually and on
behalf of other similarly situated,

     Plaintiffs,

  v.

RUDOLF SAMANDAROV a/k/a RUDY
SAMANDAROV, GROUP AMERICAR
TRANSPORTATION LLC, BC LEASING,
CORP. and individual partners of corporate
defendants,

     Defendants.

------------------------------------------------------------

Declaration of Rudolf Samandarov

------------------------------------------------------------

Eric B. Kaviar, Esq.
Attorney for Defendants
712 Third Avenue
Brooklyn, New York 11232
(718) 965-6146

------------------------------------------------------------

Marina Trubitsky and Associates PLLC
Attorneys for Plaintiffs
11 Broadway, Suite 861
New York, New York 10004
(212) 732-7077