UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Nº 07 Civ. 6706 (RJS)
_____

TADEUSZ KOWALEWSKI, NICHOLAS KLIMIUK, OLEG LOGUNOVSKI, AND STANISLAW PUCHALA,

Plaintiffs,

VERSUS

RUDOLF SAMANDAROV, GROUP AMERICAR TRANSPORT LLC, AND BC LEASING, CORP.,

Defendants.

MEMORANDUM AND ORDER
October 23, 2008

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Tadeusz Kowalewski ("Kowalewski"), Nicholas Klimiuk ("Klimiuk"), Oleg Logunovski ("Logunovski"), and Stanislaw Puchala ("Puchala") bring this action against Defendants Rudolf Samandarov ("Samandarov"), Group American Transportation ("Americar"), and BC Leasing Corp. ("BC Leasing"), alleging a violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, as well as claims under New York law for deceptive trade practices, fraudulent inducement, breach of contract, and fraud.

Before the Court is Defendants' motion to dismiss the Complaint and compel arbitration. For the reasons that follow, the Court grants Defendants' motion.

## I. BACKGROUND

Defendants are engaged in the "vehicle transportation business" colloquially known as the "Black Car" industry, so called because of the black color of the sedans used for transportation. (Samandarov Aff. ¶ 3.) Samandarov formed Defendants Americar and BC Leasing in 2004, and is the president of both companies. (*Id.* ¶¶ 1, 3.) Americar is licensed by the New York City Taxi and Limousine Commission as a base facility to dispatch commissioned "for hire" drivers in the New York City area. (*Id.* ¶ 3.) BC Leasing is an affiliated company, which assists drivers in the purchase or lease of vehicles to be used in the Black Car industry. (*Id.*)

Plaintiffs all worked for Defendant Americar as drivers. (Pls.' Opp'n ¶ 1; Logunovski Decl. ¶ 1; Klimiuk Decl. ¶ 1; Kowalewski Decl. ¶ 1.) Americar operates as a franchisor (Compl. ¶ 13), and each Plaintiff paid a fee of at least $10,000 to Americar in order to enter into a Subscription Agreement with Defendants (Compl. ¶ 17). It is undisputed that all four individual Plaintiffs entered into such Subscription Agreements. (*See id*. ¶¶ 67 (Kowalewski); 74 (Logunovski); 80 (Klimiuk); 88 (Puchala).)[1] These Subscription Agreements entitled Plaintiffs and other subscribers to "participate in the Company's referral and dispatch network." (Samandarov Decl. Ex. C ¶ 20.)

Plaintiffs filed the complaint in this action on July 25, 2007, alleging, *inter alia*, that Defendants failed to distribute the franchise offering circular for prospective franchisees (Compl. ¶ 22), failed to make disclosures of shareholder and financial information (*id.* ¶ 23), engaged in a fraudulent scheme in which "Defendants sold cars to subscribers at an inflated price, and reaped additional illegal profits when they arranged for a financing of the subscription fee and the purchase price of the car with creditors" (*id.* ¶ 24), transferred title to the cars purchased by the subscribers under the name BC Leasing (*id.* ¶ 25), confiscated cars purchased by subscribers (*id.* ¶ 26), and deducted money from Plaintiffs' paychecks for insurance and car loan purposes but failed to pay the deducted money towards the purported purpose (*id.* ¶ 27). In connection with these factual allegations, Plaintiffs assert five causes of action: (1) a violation of RICO; (2) deceptive trade practice; (3) fraudulent inducement; (4) breach of contract; and (5) fraud. (*See id.* ¶¶ 92-137.)

Defendants filed their Answer and counterclaims on September 6, 2007, and filed this motion to compel arbitration on October 30, 2007.

The issue presented by the instant motion is whether Defendants can compel arbitration of Plaintiffs' claims under the terms of the Subscription Agreement. Each Subscription Agreement contained a paragraph, entitled "Arbitration; Waiver of Trial by Jury" ("arbitration clause"). (*See, e.g.*, Samandarov Decl. Ex. C ¶ 20.) The arbitration clause provides that "[t]he sole and exclusive method of resolving any claim or controversy whatsoever between the Company, its Affiliates, and their respective officers, directors, other agents, employees and shareholders on the one hand and the Subscriber, its Affiliates, officers, directors, other agents, employees and shareholders on the other hand, unless otherwise specified in this Subscription Agreement, shall be binding arbitration according to the procedures set forth in this section." (*Id.*) After detailing the

---

[1] *See also infra* note 10.

2

relevant governing procedural mechanisms, a later passage in the arbitration clause sets out three specific exceptions to arbitration: "This section shall not apply to: (i) any claim or cause brought by the Company to enforce a non-competition agreement between the parties herein; (ii) any claim or cause arising from or in connection with the termination of this Subscription Agreement; and (iii) any claim or cause arising from or in connection with the suspension of the use of this Subscription by the Subscriber." (*Id.*)

Plaintiffs argue that this arbitration clause should not serve as the basis for compelled arbitration. First, Plaintiffs assert that they are exempt from application of the Federal Arbitration Act ("FAA" or the "Act"), 9 U.S.C. § 1 *et seq.*, by virtue of being "workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Second, Plaintiffs claim that the entire Subscription Agreement is invalid, as it is an unconscionable contract of adhesion. Third, Plaintiffs posit that even assuming the Subscription Agreement is valid, Plaintiffs' claims are not within the scope of the arbitration clause. The Court will consider each of these arguments in turn.

## II. PLAINTIFFS ARE NOT EXEMPT FROM THE FAA

The FAA governs this motion to compel arbitration. Originally enacted in 1925, the FAA's purpose "was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane *Corp.*, 500 U.S. 20, 24 (1991) (citations omitted). The FAA "creates a 'body of federal substantive law of arbitrability' applicable to arbitration agreements, . . . affecting interstate commerce." *Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Specifically, the FAA "'requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation.'" *Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) (per curiam) (quoting *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, United States*, 9 F.3d 1060, 1063 (2d Cir. 1993)).

The principal substantive provision of the FAA is 9 U.S.C. § 2, which states that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In addition, 9 U.S.C. § 4 specifically contemplates that a party may obtain an order "directing that [an] arbitration proceed in the manner provided for in [an arbitration] agreement," and 9 U.S.C. § 3 provides for a stay of legal proceedings when the court is satisfied that the issue is arbitrable under an arbitration agreement. *Id.* at §§ 3-4.

Plaintiffs contend that the FAA is not applicable to this action. Specifically, although Plaintiffs do not dispute that the Subscription Agreement is a "contract evidencing a transaction involving

3

commerce" under 9 U.S.C. § 2 — thus conceding that they are covered under the substantive provision of the Act — Plaintiffs nevertheless claim that they are exempted from the coverage of Section 2 by Section 1 of the FAA, 9 U.S.C. § 1. (*See* Pls.' Opp'n ¶ 13.)

Section 1 of the FAA specifically excludes "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiffs posit that they "drove Group American customers between New York, New Jersey, Pennsylvania and Connecticut" (Pls.' Opp'n ¶¶ 3; 14; Logunovski Decl. ¶ 3; Klimiuk Decl. ¶ 2), and thus fit into the third, residuary category of exclusions, that pertaining to "*any other class of workers engaged in foreign or interstate commerce*" (the "residuary exemption") (emphasis added). Plaintiffs cite no relevant case law in support of this contention.

The principal Supreme Court decision discussing the breadth of the residuary exemption is *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), in which the Supreme Court rejected the interpretation that the residuary exemption excludes "all contracts of employment" from the coverage of the FAA. *Id.* at 112. The Supreme Court agreed with the view endorsed by the majority of the Courts of Appeals at the time, which limited the residuary exemption to "transportation workers," defined "as those workers 'actually engaged in the movement of goods in interstate commerce.'" *Id.* (quoting *Cole v. Burns Int'l Sec. Serv.*, 105 F.3d 1465, 1471 (D.C. Cir. 1997)).

The Court of Appeals for the Second Circuit was one of the circuits that had adopted this majority view. In *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064 (2d Cir. 1972), the Second Circuit limited the residuary exemption to workers in the "transportation industry" or those "in, or closely related to the actual movement of goods in interstate commerce." *Id.* at 1069. Following *Erving*, district courts in the Second Circuit narrowly interpreted the residuary exemption. "'[T]he reference to 'seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce,' suggests that Congress intended to refer to workers engaged in commerce in the same way that seamen and railroad workers are.'" *Powers v. Fox Television Stations, Inc.*, 923 F. Supp. 21, 23 (S.D.N.Y. 1996) (quoting *DiCrisci v. Lyndon Guar. Bank of New York*, 807 F. Supp. 947, 953 (W.D.N.Y. 1992)); *see also Rojas v. TK Commc'ns*, 87 F.3d 745, 748 (5th Cir. 1996) ("'The exclusionary clause of § 1 of the Arbitration Act should be narrowly construed to apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are.'" (quoting *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 600-01 (6th Cir. 1995))).

In *Circuit City*, the Supreme Court agreed that this narrow interpretation of the residuary exemption was in accord with congressional intent. The Supreme Court held that in articulating the exceptions found in Section 1 of the FAA, Congress did not intend to regulate to the full extent of its commerce

4

power.² *See Circuit City*, 532 U.S. at 114-19. Rather, relying on the statutory canon of *ejusdem generis*, which provides that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *id.* at 114-15 (internal quotation marks and citation omitted), the Supreme Court found that the residuary exemption "should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it." *Id.* at 115. The Supreme Court thus held that Congress intended only to exempt a narrow category of workers, like "seamen" and "railroad workers" engaged in the "free flow of goods." *Id.* at 121 ("As for the residual exclusion of 'any other class of workers engaged in foreign or interstate commerce,' Congress' demonstrated concern with transportation workers and their necessary role in the free flow of goods explains the linkage to the two, specific, enumerated types of workers identified in the preceding portion of the sentence."). Explaining Congress' decision to exempt these two categories of workers, the Supreme Court wrote that "[i]t is reasonable to assume that Congress excluded 'seamen' and 'railroad employees' from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers." *Id.*

The issue presented by the instant case is whether Plaintiffs — who at times transport passengers across state lines as part of a car service — qualify under this residuary exemption for "workers engaged in foreign or interstate commerce." Although the Supreme Court in *Circuit City* narrowly interpreted the residuary exemption, linking the exemption to "railroad employees" and "seamen," the Supreme Court did not provide much guidance in determining which "transportation workers" would fall under the scope of the residuary exemption. The Second Circuit has not yet had an opportunity to clarify how courts should conduct this determination. Although several other circuit courts throughout the country have addressed the topic, little consensus has been realized.³ If there is one area of clear common ground among the federal courts to address this question, it is that truck drivers — that is, drivers actually involved in the interstate transportation of physical goods — have been found to be "transportation workers" for purposes of the residuary exemption in Section 1 of the FAA. *See, e.g.*, *Lenz v.*

---

² This is in contrast to the substantive coverage provision of the FAA, 9 U.S.C. § 2, which exercises Congress's Commerce Clause Power to the broadest possible extent. *See, e.g.*, *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003).

³ The Court acknowledges, but declines to explicitly follow, the analysis articulated by the Eighth Circuit in *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348 (8th Cir. 2005), setting forth eight "non-exclusive" factors to be considered "in determining whether an employee is so closely related to interstate commerce that he or she fits within the §1 exemption of the FAA." *Id.* at 352-53. While *Lenz* informs the Court's analysis, the *Lenz* factors were formulated in a specific context — determining whether a worker one step removed from the actual physical delivery of goods fell under the residuary exemption — not at issue in the instant case. *See infra* note 6.

5

*Yellow Transp., Inc.*, 431 F.3d 348, 351 (8th Cir. 2005) ("Indisputably, if Lenz were a truck driver, he would be considered a transportation worker under § 1 of the FAA." (citations omitted)); *Palcko v. Airborne Express*, 372 F.3d 588, 593-94 (3d Cir. 2004) (assuming that truck drivers fall within the residuary exemption); *Harden v. Roadway Packaging Sys.*, 249 F.3d 1137, 1140 (9th Cir. 2001) (finding that a "delivery driver" falls within the residuary exemption); *Carr v. Transam Trucking, Inc.*, No. 07 Civ. 1944 (BD), 2008 WL 1776435, at *2 (N.D. Tex. Apr. 14, 2008) ("Truck drivers, like plaintiff, are considered "transportation workers" within the meaning of this exemption." (citations omitted)); *Veliz v. Cintas Corp.*, No. 03 Civ. 1180 (SBA), 2004 WL 2452851, at *5 (N.D. Cal. Apr. 5, 2004) ("The most obvious case where a plaintiff falls under the FAA exemption is where the plaintiff directly transports goods in interstate [commerce], such as [an] interstate truck driver whose primary function is to deliver mailing packages from one state into another." (citation omitted)); *see also Rosen v. Transx Ltd.*, 816 F. Supp. 1364, 1371 (D. Minn. 1993) (finding that a truck driver falls within the residuary exemption); *Cent. States, Se. & Sw. Areas Pension Fund v. Tank Transp., Inc.*, 779 F. Supp. 947, 949 (N.D. Ill. 1991) (same).

Turning to address squarely the question at hand, the Court rejects Plaintiffs' implicit contention that transporting passengers across state lines as part of a car service constitutes being a "worker[] engaged in foreign or interstate commerce." While "railroad employees" and "seamen" undoubtedly sometimes transport people interstate, both of these industries also involve the interstate transportation of physical goods.[4] Indeed, the Supreme Court emphasized the "physical goods" aspect of the two industries in *Circuit City*, noting "Congress' demonstrated concern with transportation workers and their necessary role in the free flow of goods." *Circuit City*, 532 U.S. at 121. The extant case law is harmonious with the proposition that the interstate shipment of physical *goods* is central to the analysis, given, for example, the consensus among courts that truck drivers — workers dedicated to the interstate shipment of physical goods — fall within the narrow residuary exemption.[5] The Court thus finds

---

[4] Neither "seamen" nor "railroad employees" is defined in the FAA. At least one court has explored the original meaning behind the terms "seamen" and "railroad employees." *See, e.g., Veliz v. Cintas Corp.*, No. 03. Civ. 1180 (SBA), 2004 WL 2452851, at *3-4 (N.D. Cal. Apr. 5, 2004).

[5] As noted in several pre-*Circuit City* decisions, "[n]umerous courts have limited the exclusion to 'workers actually engaged in interstate commerce,' including *bus drivers* and truck drivers." *Am. Postal Workers Union v. United States Postal Serv.*, 823 F.2d 466, 473 (11th Cir. 1987) (citations omitted) (emphasis added). However, this language is misleading. *Postal Workers*, despite containing this language, involved postal workers, not bus drivers, and the case that *Postal Workers* cites as support for this proposition, *Pietro Scalzitti Co. v. Int'l Union of Operating Eng'rs*, 351 F.2d 576 (7th Cir. 1965), does not make any mention of bus drivers. Post-*Circuit City* courts persist in quoting this unsubstantiated language from *Postal Workers*. *See, e.g., Lenz*, 431 F.3d at 351 (quoting this language from *Postal Workers*); *Gagnon v. Serv. Trucking Inc.*, 266 F. Supp. 2d 1361, 1364 n.8 (M.D. Fla. 2003) (same). In fact, this Court could only find two (related) FAA cases actually pertaining to bus drivers. *See Pennsylvania Greyhound Lines v. Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of America, Div.*, 1063, 193 F.2d 327 (3d Cir. 1952); *Amalgamated Ass'n of Street Elec., Ry. & Motorcoach Empl. of Am. Local 1210 v. Pennsylvania Greyhound Lines, Inc.*, 192 F.2d 310 (3d Cir. 1951). As described by a later court in the

the involvement of physical goods to be an indispensable element[6] to being "engaged in commerce in the same way that seamen and railroad workers are." *Powers*, 923 F. Supp. at 23 (internal quotation mark and citation omitted). *Cf. Tran v. Texan Lincoln Mercury, Inc.*, 07 Civ. 1815, 2007 WL 2471616, at *5 (S.D. Tex. Aug. 29, 2007) ("[W]orkers who are not engaged in the movement of goods in interstate commerce as seamen and railroad workers cannot be excluded from the FAA under Section 1 of the Act. . . . [A] transportation worker is someone who works in the transportation industry — an industry whose mission it is to move goods."). So finding, the Court holds that transporting passengers interstate as part of a car service is too far removed from the type of work engaged in by seamen and railroad workers — that is, being a member of an industry that primarily involves the actual, physical movement of goods through interstate commerce. *Cf. Bacashihua v. United States Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988) (finding that the concern is "not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce").[7]

Such a holding is in accord with the Supreme Court's decision in *Circuit City*, which found that the exemption in the FAA for railroad employees and seamen was motivated by a desire not to upset pre-existing or developing statutory schemes in those areas. Here, unlike in *Circuit City*, there is no suggestion that applying the FAA to the Black Car industry would upset any pre-existing or developing statutory scheme. Furthermore,

---

Third Circuit, "[i]t appears that the Amalgamated employees were bus drivers; however, the court did not address the issue and did not rely on this fact in its decision." *Royal Pioneer Paper Box Mfg. Co. v. United Paper Workers Int'l. Union Local 286*, No. 96-310, 1997 WL 330391, at *2 (E.D. Pa. June 5, 1997).

[6] It should be noted that while courts agree that workers involved in the actual physical delivery of interstate packages fall within the residuary exemption, there is a circuit split regarding whether workers one step removed from the actual physical delivery still fall within the exemption. *Compare Lenz*, 431 F.3d at 352-53 (finding that a "customer service representative" for a trucking company does not fall within the residuary exemption), *Perez v. Globe Airport Sec. Servs.*, 253 F.3d 1280, 1284 (11th Cir. 2001) (finding that a pre-departure security agent at an international airport who inspected goods and people at the airport does not fall within the residuary exemption) (vacated due to parties' stipulation of dismissal), *and Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1471-72 (D.C. Cir. 1997) (finding that a security guard at a train station does not fall within the residuary exemption), *with Palcko*, 372 F.3d at 593-94 (finding that a "field services supervisor" of delivery drivers falls under the residuary exemption), *and Zamora v. Swift Transp. Co.*, No. 07 Civ. 400 (KC), 2008 WL 2369769, at *7-8 (W.D. Tex. June 3, 2008) (finding that a "terminal manager" for a trucking company falls under the residuary exemption). There is also a series of cases finding that postal workers who process packages that move interstate (and who are not directly involved in the actual transportation of packages) are exempt from the FAA under the residuary exemption. *See Bacashihua v. United States Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988); *Am. Postal Workers Union*, 823 F.2d at 473. None of these cases suggest that an industry that involves *only* the interstate transportation of *people* should be exempted from the FAA.

[7] This holding thus avoids the "absurd result" that railroad employees involved in the transportation of goods would be exempt from the FAA, while railroad employees involved in the transportation of people would not be exempt from the FAA. *See Lepera v. ITT Corp.*, No. 97 Civ. 1461, 1997 WL 535165, at *7 (E.D. Pa. Aug. 12, 1997) (noting that the same logic should apply to airline pilots).

adopting Plaintiffs' interpretation would in effect extend the scope of the residuary exemption to any "transportation worker" who crosses state lines, as long as the worker is transporting people or goods. *Cf. Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1289 (11th Cir. 2005) ("The emphasis [of *Circuit City*] . . . was on a class of workers in the transportation industry, rather than on workers who incidentally transported goods interstate as part of their job in an industry that would otherwise be unregulated."). Expanding the scope of the residuary exemption so broadly would be contrary to the prevailing 21st century judicial attitude toward arbitration. As noted, Congress enacted the FAA to reverse the judicial hostility towards arbitration that existed in the English common courts and that persisted in American courts through the first part of the 20th century. *Gilmer*, 500 U.S. at 24. The line of Supreme Court cases culminating in *Circuit City* have forcefully emphasized this point, and in particular, "have been clear in rejecting the supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context." *Circuit City*, 532 U.S. at 123. Absent clear authority to the contrary, which is lacking in this case, the Court finds that it should enforce the federal policy favoring arbitration as an alternate dispute resolution method.

In fact, the Court's decision today is consistent with the handful of cases in this Circuit that have found that a worker falls under the residuary exemption. These cases all involve workers who either physically move goods through interstate commerce, such as truck drivers, or workers who are closely tied to this movement of interstate goods, such as air cargo agents. *See, e.g.*, *Valdes v. Swift Transp. Co., Inc.*, 292 F. Supp. 2d 524, 528 (S.D.N.Y. 2003) (involving a driver for an interstate motor carrier); *Papetti v. Compagnie Nationale Air France*, No. 97 Civ. 2921, 1998 WL 667932, at *2 (E.D.N.Y. Aug. 14, 1998) (involving an "air cargo agent[,] physically moving freight, which eventually made its way to various destinations throughout the United States and the world").[8]

The Court thus holds that Plaintiffs are not "workers engaged in foreign or interstate commerce" under the residuary exemption of Section 1 of the FAA, and that therefore, the FAA governs this motion to compel arbitration.[9] So finding, the Court will now

---

[8] By contrast, courts in this Circuit have consistently found that workers not involved with the actual, physical movement of goods through interstate commerce do not fall under the residuary exemption, regardless of the workers' ultimate impact on interstate commerce. *See, e.g.*, *Jamaica Buses, Inc. v. Transport Workers' Union-AFL CIO, Local 100*, No. 02 Civ. 2533 (SJ), 2003 WL 1621026, at *3 (E.D.N.Y. Mar. 26, 2003) (involving an intrastate bus driver); *Arakawa v. Japan Network Group*, 56 F. Supp. 2d 349, 353 (S.D.N.Y. 1999) (involving an administrative assistant in a sales department); *Litaker v. Lehman Bros. Holdings, Inc.*, No. 97 Civ. 1607 (DC), 1999 WL 619638, at *5 (S.D.N.Y. Aug. 16, 1999) (involving an administrative assistant at a financial services company); *Hoffman v. Aaron Kamhi Inc.*, 927 F. Supp. 640, 643 n.1 (S.D.N.Y. 1996) (involving a production manager); *Powers v. Fox Television Stations, Inc.*, 923 F. Supp. 21, 23-24 (S.D.N.Y. 1996) (involving a television reporter).

[9] Since the Court finds that the FAA governs this motion to compel arbitration, the Court will not consider Defendants' argument that, in the alternative, Plaintiffs are independent contractors and therefore, the residuary exemption, which only pertains to "workers," should not apply. (*See* Defs.' Mem. at 11-13; Defs.' Reply at 3-4; Pls.' Opp'n at 6-8.)

consider the merits of the motion to compel arbitration, applying the well-developed body of federal substantive law that governs motions under the FAA. *See, e.g.*, *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996) ("The Federal Arbitration Act creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" (quoting *Moses H. Cone*, 460 U.S. at 24)).

III. THE ARBITRATION CLAUSE CONTAINED IN THE SUBSCRIPTION AGREEMENT IS ENFORCEABLE

In evaluating a motion to compel arbitration brought under Section 4 of the FAA, 9 U.S.C. § 4, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

In the Second Circuit, to determine whether parties have agreed to submit a particular dispute to arbitration, a court must resolve four issues: "first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." *Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 75-76 (2d Cir. 1998) (citing *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987)); *see also, e.g.*, *JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (citation omitted); *Brownstone Inv. Group v. Levey*, 514 F. Supp. 2d 536, 549 (S.D.N.Y. 2007) (citations omitted); *Sinnett v. Friendly Ice Cream Corp.*, 319 F. Supp. 2d 439, 443 (S.D.N.Y. 2004) (citation omitted).

Although Plaintiffs only contest the first two issues, the Court will consider each of these four criteria.

A. Whether the Parties Agreed to Arbitrate

It is undisputed that all four individual Plaintiffs entered into Subscription Agreements. (*See* Compl. ¶¶ 67 (Kowalewski); 74 (Logunovski); 80 (Klimiuk); 88 (Puchala).) There is also no disagreement that Paragraph 20 of each Subscription Agreement contained an arbitration clause, entitled "Arbitration; Waiver of Trial by Jury." (*See* Samandarov Decl. Exs. C (Kowalewski); D (Logunovski); E (Puchala).)[10]

---

[10] As Plaintiffs note, there is no Subscription Agreement in the record for Plaintiff Klimiuk. However, Plaintiffs admit in the Complaint that Klimiuk entered a Subscription Agreement (*see* Compl. ¶ 80), and do not assert that the Subscription Agreement signed by Klimiuk differs in any way from the three Subscription Agreements in the record (*see* Pls.' Opp'n ¶ 9).

Further, although Plaintiffs allege that the versions of the Subscription Agreements for Logunovski and Kowalewski relied on by the Defendants are different from the originals in the possession of Logunovski and Kowalewski (*see* Pls.' Opp'n ¶ 11), the arbitration clauses of both sets of agreements are identical (*Compare* Samandarov Decl. Exs. C ¶ 20, *and id.* D ¶ 20, *with* Kowalewski Decl. Ex. A ¶ 20, *and* Logunovski

Notwithstanding these facts, Plaintiffs argue that they did not agree to arbitrate their claims, because the Subscription Agreements are unconscionable contracts of adhesion. (*See* Pls.' Opp'n ¶ 10.) Specifically, Plaintiffs contend that they "were coerced into signing of their Subscription Agreements because they were expressly prohibited from reading any of the provisions of the Subscription Agreement and were not given any explanation as to any of its terms before they signed it. [Additionally,] Logunovski was threatened by Samandarov with the loss of his job unless he sign[ed] the Subscription agreement." (*Id.* (citations omitted).)

Plaintiffs do not assert that the *arbitration clause itself* was induced by fraud or misrepresentation. Rather, Plaintiffs are plainly asserting that the Subscription Agreement, as a whole, amounts to a contract of adhesion. (*See id.* ¶¶ 10-11.) On this point, it is well established that a challenge of unconscionability to the whole contract, as opposed to the arbitration provision specifically, is "an arbitrable matter not properly considered by a court." *JLM Indus.*, 387 F.3d at 170 (following the principle announced in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395 (1967), and finding that "[c]laims of unconscionability and adhesion contracts are similarly included within the *Prima Paint* rule"). "[W]here a party challenges the *validity of a contract* (that includes an arbitration provision) *as a whole* — rather than the validity of the arbitrator provision itself, or a separate arbitration agreement — the arbitrator must decide that issue." *Bar-Ayal v. Time Warner Cable Inc.*, No. 03

---

Decl. Ex. A ¶ 20).

Civ. 9905 (KMW), 2006 WL 2990032, at *6 (S.D.N.Y. Oct. 16, 2006) (emphasis in original); *see also, e.g., Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 667 (2d Cir.. 1997) (finding that "[s]ince there [wa]s no fraud or misrepresentation that relate[d] directly to the arbitration clause," the district court properly sent the case to arbitration); *Coffer v. Serv. Asset Mgmt. Co.*, No. 02 Civ. 9934 (DC), 2003 WL 22493425, at *3 (S.D.N.Y. Nov. 3, 2003) ("Courts distinguish between claims of fraudulent inducement of the contract as a whole and claims of fraud in the inducement of the arbitration clause. If a claim of fraudulent inducement relates to the contract generally, and the contract contains an arbitration clause, the language of the FAA provides that the dispute must be adjudicated by the arbitrator." (citations omitted)); *Wright v. SFX Entm't Inc.*, No. 00 Civ. 5354 (SAS), 2001 WL 103433, at *3 (S.D.N.Y. Feb. 7, 2001) ("The teaching of *Prima Paint* is that a federal court must not remove from the arbitrators' consideration of a substantive challenge to a contract unless there has been an independent challenge to the making of the arbitration clause itself." (internal quotation marks and citations omitted)).

The Court therefore finds that Plaintiffs' argument that the Subscription Agreement constitutes an unconscionable contract of adhesion is an issue for the arbitration panel to decide.

B. The Scope of the Arbitration Clause

Plaintiffs next contend that "the claims asserted by Plaintiffs in this action are not covered by the arbitration clause of the Subscription Agreement." (Pls.' Opp'n ¶ 12.)

The arbitration clause provides that "the sole and exclusive method of resolving any claim or controversy whatsoever between the Company, . . . on the one hand and the Subscriber, . . . on the other hand, unless otherwise specified in this Subscription Agreement, shall be binding arbitration according to the procedures set forth in this section." (*See, e.g.*, Samandarov Decl. Ex. C ¶ 20 (Kowalewski).)[11]

Plaintiffs argue that their claims fall under an exception "otherwise specified in this Subscription Agreement." A later passage in the arbitration clause sets out three specific exceptions to the earlier provision's requirement of binding arbitration. "This section shall not apply to: (i) any claim or cause brought by the Company to enforce a nonompetition agreement between the parties herein; (ii) *any claim or cause arising from or in connection with the termination of this Subscription Agreement;* (iii) any claim or cause arising from or in connection with the suspension of the use of this Subscription by the Subscriber." (*Id.* (emphasis added).) Plaintiffs posit that their claims fall under the second exclusion, as they "arise from or in connection with the termination of the subscription agreement." (Pls.' Opp'n ¶ 12.)[12]

"'[A] disagreement about whether an arbitration clause . . . applies to a particular type of controversy is for the court [to decide].'" *JLM Indus.*, 387 F.3d at 171 (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (alteration in original)). It is thus within the purview of this Court to interpret the scope of the arbitration clause. In making this determination, a district court must first determine whether an arbitration agreement is "broad" or "narrow." *See, e.g.*, *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001); *Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 49-50 (2d Cir. 2000); *Peerless Imps., Inc. v. Wine, Liquor & Distillery Workers Union Local One*, 903 F.2d 924, 927 (2d Cir. 1990); *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988). "Where the arbitration clause is broad, 'there arises a presumption of arbitrability.'" *Louis Dreyfus*, 252 F.3d at 218 (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 23 (2d Cir. 1995)). However, "if the clause is 'narrow,' arbitration should not be compelled unless the court determines that the dispute falls within the clause." *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir. 1983). "[I]f reviewing a narrow clause, the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Louis*

---

[11] As the Court previously noted, all of the Subscription Agreements in the record are identical with respect to this particular provision, and there is no allegation that the one missing Subscription Agreement differs in any way. *See supra* note 10.

[12] Although Plaintiffs also quote the language of the third exception, that "arising from or in connection with the suspension of the use of this Subscription by the Subscriber," Plaintiffs only argue that their "claims here do arise from or in connection with the termination of the subscription agreement." (Pls.' Opp'n ¶ 12.) Further, there is no allegation in any of the documents before the Court that Plaintiffs, as subscribers, suspended the use of the Subscription Agreement. Therefore, insofar as Plaintiffs claim that they also fit under this third exception, the Court finds any such argument to be without merit.

11

*Dreyfus*, 252 F.3d at 218 (quoting *Rochdale Vill., Inc. v. Pub. Serv. Employees Union*, 605 F.2d 1290, 1295 (2d Cir. 1979)).

The Court notes that the expansive language contained within the arbitration clause in the instant case, establishing arbitration as "the sole and exclusive method of resolving any claim or controversy whatsoever" is similar to language in arbitration clauses that the Second Circuit has found to constitute "broad" language. *See, e.g.*, *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 223, 226 (2d Cir. 2001) (finding the language "in the event of any difference arising between the contracting parties it shall be submitted to arbitration" to be "unquestionably sufficiently broad"). However, the Court finds it unnecessary to characterize the arbitration clause as being "broad" or "narrow," since the Court finds that the dispute is, on its face, within its scope, and thus would satisfy the requirement for even a "narrow" arbitration clause.

"When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001). In this case, the Subscription Agreement provides that New York law should govern any disputes over the Agreement's construction (*see, e.g.*, Samandarov Decl. Ex. C at ¶ 15), and no party disputes that New York law is applicable. Under New York law, "[l]ike any other contract, courts must interpret an arbitration provision to give effect to the parties' intent as expressed by the plain language of the provision." *John Hancock*, 254 F.3d at 58 (citations omitted).

The Court's application of these basic contract principles is informed by the Supreme Court's declaration that, under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25. "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT&T Techs, Inc. v. Commc'n Workers of America*, 475 U.S. 643, 670 (1986) (internal quotation marks and citations omitted) (second alteration in original).

The Second Circuit has likewise recognized that because of the "strong federal policy favoring arbitration . . . doubts as to whether a claim falls within the scope of [the] agreement should be resolved in favor of arbitrability." *ACE Capital Re Overseas Ltd. v. Cent. United Life. Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002) (internal quotation marks and citations omitted). "Another way of expressing this is to say that arbitration must not be denied unless a court is positive that the clause it is examining does not cover the asserted dispute." *Spear, Leeds & Kellogg v. Central Life Assur. Co.*, 85 F.3d 21, 28 (2d Cir. 1996) (citing *AT&T Techs.*, 475 U.S. at

650); *see also Thomas James Assocs. v. Jameson*, 102 F.3d 60, 65 (2d Cir. 1996) ("[A]rbitration must be preferred unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (internal quotation marks and citations omitted)).

Guided by the presumption in favor of arbitration, but mindful that arbitration is still a "matter of contract," *see Vera*, 335 F.3d at 116, the Court must inquire as to whether Plaintiffs' claims fall under the applicable exception to arbitration provided in the arbitration clause — that is, whether Plaintiffs' "claim[s] or cause[s] aris[e] from or in connection with the termination of this Subscription Agreement."[13] If not, Plaintiffs' claims will fall under the broadly written arbitration clause that covers "any claim or controversy whatsoever" between the parties.

In interpreting the meaning of the phrase "termination of this Subscription Agreement," the Court may look to other provisions of the Subscription Agreement. "'A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'" *Adams v. Suozzi*, 433 F.3d 220, 228 (2d Cir. 2005) (quoting *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003)). Looking at the Subscription Agreement as a whole, the phrase "Termination of the Subscription Agreement" appears in the subject lines of Paragraphs 9 and 10 of the Agreement. (*See, e.g.*, Samandarov Decl. Ex. C ¶¶ 9-10.)[14] Paragraph 9 addresses termination of the Subscription Agreement by the subscriber (*id.* ¶ 9), and Paragraph 10 addresses termination of the Subscription Agreement by the Company (*id.* ¶ 10). Both paragraphs specifically enumerate grounds by which either party may terminate the Agreement. (*id.* ¶¶ 9-10.) For example, the "Subscriber may terminate this Subscription Agreement in the event of a material breach of, or default under, this Subscription Agreement by the Company or on any grounds available by law." (*Id.* ¶ 9.)

The Court construes the language of the relevant exception, "any claim or cause arising from or in connection with the termination of this Subscription Agreement," in conjunction with these paragraphs.

---

[13] Although the Second Circuit has found that "[i]n determining whether a particular claim falls within the scope of the parties' arbitration agreement, this Court focus[es] on the factual allegations in the complaint rather than the legal causes of action asserted," *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17, 36 (2d Cir. 2002) (quoting *Genesco,* 815 F.2d at 846 (internal quotation marks omitted) (alteration in original)), the arbitration clause here specifically exempts "any claim or cause arising from or in connection with the termination of this Subscription Agreement." Thus, the Court will examine both the Plaintiffs' factual allegations *and* the legal causes of action asserted in order to determine whether the causes of action asserted "arise from or in connection with the termination of this Subscription Agreement."

[14] Plaintiffs allege that the versions of the Subscription Agreements for Logunovski and Kowalewski relied on by Defendants are different from the originals of the Subscription Agreements in the possession of Logunovski and Kowalewski. *See supra* note 10. However, just as the arbitration clauses of each Subscription Agreement are identical, paragraphs 9 and 10 of both sets of agreements are identical as well. (*Compare* Samandarov Decl. Exs. C ¶¶ 9-10, *and id.* D ¶¶ 9-10, *with* Kowalewski Decl. Ex. A ¶¶ 9-10, *and* Logunovski Decl. Ex. A ¶¶ 9-10.)

"Termination of the Subscription Agreement" is given a particular, and limited, meaning — an action brought by the Subscriber (or the Company) to terminate the Agreement.

With this in mind, the Court looks at the claims brought by the Plaintiffs in this case. Plaintiffs' Complaint revolves around an allegedly fraudulent scheme undertaken by Defendants, which involved, *inter alia*, selling cars to subscribers at inflated prices, arranging for financing of subscription fees and the purchase price of cars, transferring the titles of the cars without Plaintiffs' permission, and confiscating the cars purchased by Plaintiffs. (*See* Compl. ¶¶ 13-33.) Plaintiffs bring five causes of action, alleging a violation of RICO, as well as common law claims of deceptive trade practice, fraudulent inducement, breach of contract, and fraud. (*See id.* ¶¶ 92-137.) Fairly considered, none of these claims "aris[e] from or in connection with the termination of this Subscription Agreement" as just defined, because they do not arise from or in connection with an action brought by Plaintiffs (or the Company) to terminate the Subscription Agreement.

Mindful of the Supreme Court's instructions that "there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with *positive assurance* that the arbitration clause is *not susceptible* of an interpretation that covers the asserted dispute," *AT&T Techs.*, 475 U.S. at 670 (internal quotation marks and citations omitted) (emphasis added), and that "[d]oubts should be resolved in favor of coverage," *id.*, the Court finds that Plaintiffs' claims do not "arise[] from or in connection with the termination of th[e] Subscription agreement."

Accordingly, the Court holds that Plaintiffs' claims fall within the broadly written arbitration clause that covers "any claim or controversy whatsoever" between the parties.

C. Arbitrability of Federal Claims

The third inquiry involves the arbitrability of any federal statutory claims asserted. Plaintiffs assert only one federal statutory claim, a violation of RICO. (*See* Compl. ¶¶ 92-107.) Arbitration agreements relating to RICO claims are indisputably enforceable. In *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987), the Supreme Court found "no basis for concluding that Congress intended to prevent enforcement of agreements to arbitrate RICO claims." *Id.* at 242; *see also, e.g.*, *Gilmer*, 500 U.S. at 26; *Genesco*, 815 F.2d at 851-852.

Having found that Plaintiffs' RICO claim is arbitrable, the Court notes that Plaintiffs' "pendent state law claims are also arbitrable." *Norcom Electronics Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 206 (S.D.N.Y. 2000) (internal quotation marks and citations omitted).

D. Staying or Dismissal of Claims

Although staying, and not dismissing, all arbitrable claims is a remedy specifically contemplated by the FAA, *see* 9 U.S.C. § 3, "[a]ll courts of which we are aware have followed the rule that, [w]here all of the issues raised in the Complaint must be submitted to arbitration, the Court may dismiss an action rather than stay proceedings." *Spencer-Franklin v. Citigroup/Citibank N.A.*, No. 06 Civ. 3475 (GBD) (GWG), 2007 WL 521295, at *4

(S.D.N.Y. Feb. 21, 2007) (internal quotation marks and citations omitted) (second alteration in original) (collecting cases). "Thus, where defendants have sought dismissal rather than a stay, courts in this district have granted dismissal." *Id.* (collecting cases); *see also, e.g.*, *Mazza Consulting Group, Inc. v. Canam Steel Corp.*, No. 08 Civ. 38 (NGG), 2008 WL 1809313, at *7 (E.D.N.Y. Apr. 21, 2008); *Valdes v. Swift Transp. Co, Inc.*, 292 F. Supp. 2d 524, 534 (S.D.N.Y. 2003); *Lewis Tree Serv., Inc. v. Lucent Technologies, Inc.*, 239 F. Supp. 2d 332, 340 (S.D.N.Y. 2002); *Mahant v. Lehman Bros.*, No. 99 Civ. 4421 (MBM), 2000 WL 1738399, at *3 (S.D.N.Y. Nov. 22, 2000).

IV. CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED. Accordingly, the Court dismisses the Complaint without prejudice and compels Defendants to arbitrate its claims pursuant to the terms set forth in the Subscription Agreements. Plaintiffs are hereby granted leave to re-file within thirty days after the arbitration is completed if they wish to seek further relief from this Court. The Clerk of Court shall enter judgment accordingly and this case shall be closed.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: October 23, 2008
New York, New York

\* \* \*

Plaintiffs are represented in this matter by Marina Trubitsky, Esq., Marina Trubitsky & Associates, PLLC, 11 Broadway, Suite 861, New York, New York 10004, and Defendants are represented by Eric B. Kaviar, Esq., 712 Third Avenue, Brooklyn 11232.

15